ROBERT W. CLARK, M.D., INC. et al., Appellees,

v.

MOUNT CARMEL HEALTH, Appellant.

[Cite as *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health* (1997), 124 Ohio App.3d 308.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APE10–1345.

Decided Nov. 20, 1997.

*Gary W. Hammond* and *David Wm. T. Carroll,* for appellees.

*Arter & Hadden, Danny L. Cvetanovich* and *Nancy Manougian,* for appellant.

PETREE, Judge.

Defendant, Mount Carmel Health ("Mount Carmel"),[1] appeals from a judgment of the Franklin County Court of Common Pleas, which granted the motion for summary judgment of plaintiffs, Robert W. Clark, M.D., Inc. and Robert W. Clark, M.D., and enjoined Mount Carmel from operating a sleep disorders center in Franklin County or any contiguous county for a period of two years commencing November 21, 1997. Mount Carmel advances the following assignments of error:

"[I]. The trial court erred in failing to consider the factors that the Ohio Supreme Court and this court have mandated must be considered when deciding whether to enforce a covenant not to compete: whether enforcement of the covenant is necessary to protect any 'legitimate interest' of the party seeking enforcement; whether enforcement of the covenant would impose an undue hardship on the party seeking to compete; and whether enforcement of the covenant would injure the public.

"[II]. The trial court erred in failing to consider the factors that the Ohio Supreme Court and this court have mandated must be considered when deciding whether to grant injunctive relief: whether the party seeking injunctive relief has proven 'irreparable harm' by clear and convincing evidence and whether the grant of injunctive relief would harm other parties and the public.

"[III]. The trial court erred in granting Clark's motion for summary judgment despite the existence of numerous genuine issues of material fact, including whether enforcement of the covenant not to compete is necessary to protect any 'legitimate interest' of Clark; whether the closure of Mount Carmel's sleep-disorders center would impose an undue hardship on Mount Carmel; whether the closure of the center would injure the public; and whether Clark would sustain 'irreparable harm' if Mount Carmel continued to operate its sleep-disorders center."

Plaintiff, Robert W. Clark, M.D., Inc. ("Clark Corporation"), is an Ohio professional corporation engaged in the practice of sleep medicine. Plaintiff Robert W. Clark, M.D. is a board-certified neurologist with twenty years' experience in sleep medicine and is engaged in the practice of sleep medicine through the Clark Corporation. Dr. Clark is the medical director of Mount Carmel's Regional Sleep Disorders Center.

Dr. Clark was one of the first physicians to be credentialed in the field of sleep medicine and is a well-known lecturer on the subject both in this country and

---

1. Since mid-year 1995, Mount Carmel Health has been known as Mount Carmel Health System.

abroad. In the early 1980s, Dr. Clark established and directed a successful sleep disorders center at Saint Anthony Hospital ("Saint Anthony") in Columbus, Ohio. Toward the end of the 1980s, Dr. Clark decided to leave Saint Anthony due to fiscal difficulties suffered by that hospital. Accordingly, Dr. Clark initiated discussions with several area health care facilities, including Mount Carmel, regarding relocating his sleep medicine practice to another facility. It was Dr. Clark's desire to relocate his practice to a health care facility that did not have an existing sleep disorders center. At that time, Mount Carmel did not operate a sleep disorders center.

From May through November 1989, Dr. Clark and Mount Carmel engaged in extensive negotiations directed at relocating Dr. Clark's sleep medicine practice to Mount Carmel. Negotiation of the agreement was conducted by the parties' attorneys. The negotiations progressed through several drafts of a letter of intent to a final written agreement. On November 20, 1989, the parties entered into an agreement whereby Dr. Clark would relocate his sleep medicine practice from Saint Anthony to the Mount Carmel East Hospital ("Mount Carmel East") campus [2] and establish and direct a new sleep disorders center at Mount Carmel East.

Under the agreement, Dr. Clark acts as an independent contractor practicing medicine with a specialty in neurology and a subspecialty in sleep medicine and epilepsy. In addition, Dr. Clark, as medical director of the center, performs extensive administrative responsibilities in addition to providing medical services. Dr. Clark brought with him from Saint Anthony several qualified and trained sleep technologists. Mount Carmel, at its own expense, maintains space, equipment, supplies, utilities, and nonphysician personnel required for operation of the sleep disorders center. Over the life of the contract, Mount Carmel spent in excess of $1.75 million establishing, equipping, and renovating the center.

The agreement was for an initial term of seven years, automatically renewable for additional one-year terms, unless either party gave the other written notice of intention not to renew at least three hundred sixty days before the end of the term. After the initial term, Mount Carmel, citing changes occurring in the health care environment since 1989, attempted to negotiate a new agreement with Dr. Clark. The negotiations proved unsuccessful, however, and on November 19, 1996, Mount Carmel gave Dr. Clark written notice of its intention not to renew the agreement at the end of the next term. The agreement expires on November 20, 1997. After the expiration of the agreement, Dr. Clark will open a sleep

---

2. Mount Carmel East Hospital, Mount Carmel Medical Center, and St. Ann's Hospital constitute Mount Carmel Health System.

disorders center at Columbus Community Hospital. Mount Carmel intends to continue the operation of its sleep disorders center with a new medical director.

The parties do not dispute the terms of the agreement. Among the terms of the agreement are reciprocal restrictive covenants regarding the provision of sleep disorder services both during the term of the agreement and upon termination or nonrenewal of the agreement without cause. The restrictive covenant at issue provides:

"7.1–1 *Termination or Failure to Renew Without Just Cause by Hospital.* In the event the Hospital elects, in the absence of just cause as defined in paragraph 6.2–1, to terminate or fails to renew the Agreement, Hospital agrees not to operate or be involved in the operation of a similar sleep disorder center in Franklin County or any of the contiguous counties for a period of two (2) years following the Agreement termination date. Hospital also agrees that it will not relocate the Center's personnel and/or equipment to Mount Carmel Medical Center for a period of two (2) years following the Agreement termination date. Hospital further agrees that upon its breach or violation of the foregoing provisions of this paragraph, the Corporation and/or Physician shall be entitled as a matter of right to obtain relief in any court of competent jurisdiction enjoining such a breach or violation, in addition to all other remedies provided to Corporation and/or Physician at law, in equity or under the Agreement. If the period of time or the area herein specified should be judged unreasonable in any court proceeding, then the period of time shall be reduced by such number of months or the area reduced by such distance, so that the foregoing covenant not to compete may be enforced in such area and during such period of time as are judged to be reasonable. Upon the occurrence of a breach of this provision the time period herein specified shall be extended by a period of time equal to that period beginning when such violation commenced and ending when the activities constituting such violation shall have terminated."

In reciprocal fashion, paragraph 7.1–2 forbids Dr. Clark to "operate or be involved in the operation of a similar sleep disorder center in Franklin County or any of the contiguous counties" for two years if he terminates or fails to renew the agreement without just cause.

Plaintiffs filed a complaint in the trial court on December 17, 1996, against Mount Carmel[3] seeking to enforce the restrictive covenant and enjoin Mount Carmel from operating its sleep disorders center.

---

3. Dale St. Arnold and Alice M. O'Brien, Mount Carmel's chief executive officer and chief operating officer, respectively, were initially named as defendants in plaintiffs' complaint. By entry dated April 10, 1997, plaintiffs voluntarily dismissed St. Arnold and O'Brien without prejudice pursuant to Civ.R. 41(A)(1).

Plaintiffs filed a motion for summary judgment on July 17, 1997, and Mount Carmel opposed the motion. The trial court filed its decision and judgment entry on October 2, 1997. On October 10, 1997, the trial court entered a *nunc pro tunc* order to correct a misstated date in its original decision and entry. The trial court granted plaintiffs' motion for summary judgment and issued an injunction ordering Mount Carmel to close its existing sleep disorders center on November 21, 1997, and prohibiting Mount Carmel from operating that or any similar sleep disorders center in Franklin County or any contiguous county for a period of two years commencing November 21, 1997. Mount Carmel has filed this timely appeal.[4]

Pursuant to Civ.R. 56(C), summary judgment is appropriate if (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in its favor. *State ex rel. Zimmerman v. Tompkins* (1996), 75 Ohio St.3d 447, 448, 663 N.E.2d 639, 640–641.

The burden of establishing the appropriateness of summary judgment is on the moving party. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801–802. The court must view the evidence most strongly in favor of the nonmoving party and decide whether there are genuine issues of material fact that remain to be litigated. *Id.* If the evidence is such that reasonable minds could come to but one conclusion and that conclusion is adverse to the nonmoving party, then the moving party is entitled to judgment as a matter of law. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471–472, 364 N.E.2d 267, 273–274.

Restrictive covenants not to compete are disfavored by law. *Ohio Urology, Inc. v. Poll* (1991), 72 Ohio App.3d 446, 452, 594 N.E.2d 1027, 1031. This disfavor is especially acute regarding restrictive covenants concerning professional mobility of physicians and access to medical care and facilities, which affect the public interest to a much greater degree. *Id.* at 452–453, 594 N.E.2d at 1031–1032. Thus, covenants of this nature must be strictly construed in favor of professional mobility and access to medical care and facilities. *Id.* at 453, 594 N.E.2d at 1032. However, such restrictive covenants are not *per se* unenforcea-

---

4. By journal entry dated October 22, 1997, this court granted Mount Carmel's motion to expedite the appeal and stated its intention to determine the appeal prior to November 21, 1997.

ble and if reasonable may be enforced by injunctive relief. *Id.* at 454, 594 N.E.2d at 1032–1033.

■■■ For a restraint to be reasonable, it must be no greater than necessary to protect the legitimate interests of the person or entity of whom the restraint is in favor, must not impose an undue hardship on the person or entity upon whom the restraint is imposed, and must not be injurious to the public. *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544, paragraphs one and two of the syllabus. The reasonableness of the restraint must be decided on its own facts and is tested by the totality of the circumstances. *Id.* at 25, 71 O.O.2d at 14, 325 N.E.2d at 547; *Poll, supra,* 72 Ohio App.3d at 452, 594 N.E.2d at 1031. A plaintiff seeking to enforce a restrictive covenant must establish, by clear and convincing evidence, each of these three elements. *Restivo v. Fifth Third Bank of Northwestern Ohio, N.A.* (1996), 113 Ohio App.3d 516, 519, 681 N.E.2d 484, 485–486.

■■■ Further, when the equitable remedy of injunction is sought, a plaintiff must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury. *Poll, supra,* 72 Ohio App.3d at 454, 594 N.E.2d at 1032–1033. The purpose of an injunction is to prevent future injury, not to redress past wrongs. *State ex rel. Great Lakes College v. State Med. Bd.* (1972), 29 Ohio St.2d 198, 58 O.O.2d 406, 280 N.E.2d 900. The issuance of an injunction lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496, 498. "The term 'abuse of discretion' implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *State ex rel. Fogle v. Steiner* (1995), 74 Ohio St.3d 158, 161, 656 N.E.2d 1288, 1292.

As the third assignment of error is dispositive of the appeal, it will be discussed first.

■■■ Mount Carmel contends that genuine issues of material fact exist as to whether the continued operation of Mount Carmel's sleep disorders center would interfere with any legitimate interest of Dr. Clark or would cause him to suffer irreparable harm and whether the closure of the center would impose undue hardship on Mount Carmel or injury to the public. We will discuss each of Mount Carmel's contentions in turn.

■■■ One of the factors to be considered in determining the reasonableness of a covenant not to compete is whether the restriction seeks to eliminate unfair competition or merely ordinary competition. *Raimonde, supra,* 42 Ohio St.2d at 25, 71 O.O.2d at 14, 325 N.E.2d at 547. Dr. Clark argues that Mount Carmel will continue to operate its highly successful sleep center utilizing the tangible assets he brought to Mount Carmel in 1989 and developed during his seven years as

medical director, *i.e.*, a large physician-referral base; established relationships with third-party payors; trained and qualified sleep technologists; and research, skill, methods, techniques, systems, forms, and processes conducted, acquired, and developed over twenty years of sleep medicine practice. He further argues that Mount Carmel will continue to use and benefit from intangible assets acquired from Dr. Clark, including his twenty years' experience and expertise in the practice of sleep medicine, his reputation for quality treatment of patients, and innovative concepts he developed such as "split-night recordings" and "patient-outcome tracking."

Mount Carmel offers evidence in dispute of only three of these areas. Mount Carmel argues that (1) Dr. Clark does not have a legitimate interest in the "techniques" and "systems" he developed because Mount Carmel's employees authored, created, and have applied for copyrights of the computer database and software used for tracking patient outcomes; (2) Dr. Clark does not have a legitimate interest in established third-party-payor contracts because it is unlikely that any third-party payor would refuse to enter into a contract with Columbus Community Hospital if Mount Carmel were to continue to operate its sleep disorders center; and (3) Dr. Clark does not have a legitimate interest in obtaining qualified sleep technologists because the sleep technologists brought by Dr. Clark from Saint Anthony and employed by Mount Carmel do not have noncompetition agreements with Mount Carmel and are free to leave with Dr. Clark and accept positions at Columbus Community Hospital.

Even assuming that Mount Carmel has submitted sufficient evidentiary materials to create a genuine issue of material fact as to whether Dr. Clark has a legitimate interest in need of protection as to third-party-payor contracts or obtaining qualified sleep technologists, Mount Carmel's evidentiary materials regarding the development of the computer database and software are insufficient to rebut the evidence submitted by Dr. Clark that the information used to create the computer database and software was obtained using both data and forms developed and revised by Dr. Clark in his twenty-year sleep medicine practice. Further, Mount Carmel submits no evidentiary materials to rebut the facts established by Dr. Clark's evidentiary materials and the reasonable inferences that can be drawn therefrom that continued operation of its sleep disorders center, using the expertise, methods, techniques, skill, and experience acquired and developed by Dr. Clark over the course of a twenty-year career in sleep medicine, will seriously jeopardize Dr. Clark's ability to compete with the sleep disorders center he was instrumental in establishing.

Beginning November 21, 1997, Dr. Clark will be the medical director of a new sleep disorders center at Columbus Community Hospital. As medical director, Dr. Clark has an immediate interest in the initial and continuing success of that

sleep disorders center. Thus, Dr. Clark has a legitimate interest to protect against unfair competition by the sleep disorders center he was instrumental in establishing at Mount Carmel. Further, there is the threat of irreparable injury to Dr. Clark if Mount Carmel is permitted to continue operation of its sleep disorders center.

It is undisputed that Mount Carmel had no sleep disorders center prior to contracting with Dr. Clark to create one at its Mount Carmel East campus. Dr. Clark brought to Mount Carmel twenty years of expertise, research, skill, knowledge, methods, and experience in the area of sleep medicine. In addition, Dr. Clark brought with him his long-standing professional reputation for quality treatment of patients, as well as a significant referral base from other physicians. Mount Carmel's sleep disorders center has gained much of its success in large part due to the contributions of Dr. Clark. Allowing Mount Carmel's sleep disorders center to continue in operation contrary to the parties' negotiated agreement would force Dr. Clark to compete against his own reputation as he starts up his new sleep center at Columbus Community Hospital. The restrictive covenant, one of the terms of the agreement that Dr. Clark insisted be included in the agreement, was designed to protect Dr. Clark's sleep medicine practice, his sole means of support.

Furthermore, Mount Carmel not only agreed in the contract that there was sufficient interest to warrant an injunction, but in paragraph 7.1–2, the agreement would have reciprocally prohibited Dr. Clark from competing with Mount Carmel if he had given notice of nonrenewal without cause. Certainly, Mount Carmel believed at the time of contracting that there would be interests to protect if either party terminated without cause. Accordingly, this court finds that the restraint imposed by the covenant is no greater than required for Dr. Clark's protection.

Further, the very purpose of an injunction is to prevent such irreparable harm from occurring. Failure to recognize the potential for serious injury undermines the basic purpose of a covenant not to compete, which is to prevent, as far as possible, unfair competition from the use of someone else's information, experience, expertise, or skills. It would eviscerate entirely the protection of the restrictive covenant to allow Mount Carmel to continue operation of its sleep disorders center, contrary to the restrictive covenant, after Dr. Clark's association with Mount Carmel enabled it to establish a highly successful sleep disorders center, which, in turn, could destroy the sleep medicine practice established by Dr. Clark prior to his association with Mount Carmel. This is particularly so when Mount Carmel negotiated the agreement containing the restrictive covenant with the advice and assistance of an attorney.

With regard to the second prong of the *Raimonde* test, Mount Carmel argues that closing the sleep disorders center for two years, after having expended in excess of $1.75 million to establish it, would impose a serious and undue hardship, in that (1) expensive medical equipment would sit idle and could become obsolete; (2) hospital space would be wasted; (3) revenue of up to $1.5 million per year would be lost, while expenses, including lease payments, would continue to be incurred; and (4) the profit made from operation of the sleep disorders center, which is used to subsidize other, less profitable health care services, would be lost, which would in turn affect Mount Carmel's ability to provide other health care services to the public.

A determination that a covenant is unduly harsh requires a much greater standard than determining whether the covenant is merely unfair. Because it will be prevented from operating its sleep disorders center for a period of two years, Mount Carmel will certainly suffer some hardship. However, " [t]he *Raimonde* test requires more than just some hardship." *Williams v. Hobbs* (1983), 9 Ohio App.3d 331, 336, 9 OBR 599, 604, 460 N.E.2d 287, 293 (Moyer, J., concurring in part and dissenting in part). It is unreasonable to believe that Mount Carmel, a large, multifaceted health care facility will suffer *undue* hardship at the loss of its sleep disorders center for a two-year period. Moreover, Mount Carmel is in a better position to accept the consequences of its own decision not to renew the agreement than is Dr. Clark, a physician in solo practice.

Further, "[u]ndue hardship cannot be determined on a post hoc basis, but rather by the terms of the agreement at the time it was entered into." *N. Frozen Foods, Inc. v. McNamara* (Nov. 6, 1997), Cuyahoga App. No. 71378, unreported, 1997 WL 691182. Mount Carmel voluntarily entered into the agreement with Dr. Clark, which contained the restrictive covenant at issue. Mount Carmel must have anticipated that it could be hurt economically by a termination of the agreement and the corresponding invocation of the covenant not to compete. Despite such knowledge, Mount Carmel chose to terminate the contract. Thus, the harm suffered by Mount Carmel is largely of its own making. Moreover, Mount Carmel has had a year to prepare itself for the closure of its sleep disorders center and had an opportunity to make due preparation. Accordingly, this court finds that the restraint does not impose undue hardship on Mount Carmel.

Finally, in making the argument that enforcement of the covenant not to compete would impose an undue hardship, Mount Carmel essentially seeks to have this court rewrite the contract. "Too often courts have attempted to rewrite contracts for parties that appear after the fact to be more equitable to one or more of the parties. The *Raimonde* opinion acknowledges that temptation and

its test should therefore be strictly applied." *Hobbs, supra,* 9 Ohio App.3d at 336, 9 OBR at 604, 460 N.E.2d at 293 (Moyer, J., concurring in part and dissenting in part).

It is not the responsibility or function of this court to rewrite the parties' contract in order to provide for a more equitable result. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 54–55, 544 N.E.2d 920, 923–924. A contract "does not become ambiguous by reason of the fact that in its operation it may work a hardship upon one of the parties." *Id.* at 55, 544 N.E.2d at 924. "Courts uphold the principle that a contracting party may not repudiate a promise solely because that party later becomes dissatisfied with the bargain." *Fairway Assoc. v. Lesnick* (Apr. 16, 1997), Summit App. No. 7840, unreported, 1997 WL 193697. In the absence of fraud or bad faith, this court will not save one party from an improvident contract when both parties had equal bargaining power. *Ullmann v. May* (1947), 147 Ohio St. 468, 34 O.O. 384, 72 N.E.2d 63, paragraph two of the syllabus.

In regard to its argument that the restriction is injurious to the public, Mount Carmel argues that the patients who were treated at its sleep disorders center will be denied the opportunity to obtain health care treatment. However, according to Dr. Clark's affidavit, which is unrebutted by Mount Carmel, there are currently at least twelve other sleep disorders centers in the central Ohio area from which these patients could receive sleep disorders treatment, including the sleep disorders center established by Dr. Clark at Columbus Community Hospital. Thus, enforcement of the restrictive covenant would not prevent anyone from obtaining services due to Mount Carmel's absence from the marketplace. Dr. Clark's practice at Columbus Community Hospital and the other eleven sleep medicine centers operated by others in the area can sufficiently provide the services demanded by the community.

Similarly, Mount Carmel's argument that the closure of its sleep disorders center would adversely affect the persons currently employed at the center is unsupported by the evidence. Mount Carmel admits that some of these persons may be absorbed into other departments at Mount Carmel. Further, Mount Carmel admits that the sleep technologists currently employed at Mount Carmel do not have noncompetition agreements with Mount Carmel and are thus free to leave Mount Carmel and accept positions at Columbus Community Hospital or to seek employment at one of the other sleep disorders centers in central Ohio or around the country.

Mount Carmel's final argument is that the closure of its sleep disorders center would adversely affect the other physician who practices sleep medicine at its center by denying him the opportunity to practice his specialty and treat his patients at the facility of his choice. Initially, we note that the record contains no

evidence submitted by this physician that Mount Carmel is his facility of choice. Furthermore, it is undisputed that this physician has privileges at other sleep disorders centers. Thus, closure of Mount Carmel's sleep disorders center would not deny this physician the opportunity to practice his specialty at another facility. Therefore, this court finds that the restraint is not injurious to the public.

This court, having found that Dr. Clark has established by clear and convincing evidence that the restraint (1) is no greater than required for Dr. Clark's protection, (2) does not impose an undue hardship on Mount Carmel, and (3) is not injurious to the public, holds that the restrictive covenant is enforceable. Further, this court finds that Dr. Clark has established by clear and convincing evidence the existence of an actual threat of irreparable harm if the covenant is not enforced and Mount Carmel is permitted to continue operation of its sleep disorders center. Accordingly, Mount Carmel's third assignment of error is not well taken.

By the first and second assignments of error, Mount Carmel urges this court to reverse the trial court's decision because the court failed to address the factors that must be considered when deciding whether to (1) enforce a restrictive covenant, *i.e.*, whether Dr. Clark has any legitimate interest in need of protection by enforcement of the restrictive covenant; whether enforcement of the covenant would impose an undue hardship on Mount Carmel, and whether enforcement of the covenant would result in injury to the public; and (2) grant injunctive relief, *i.e.*, whether Dr. Clark will suffer irreparable harm if the covenant is not enforced. Mount Carmel argues that the trial court granted Dr. Clark's motion for summary judgment and issued the injunction "simply because Mount Carmel and Clark had entered into an Agreement that contains a covenant not to compete."

In large part, Mount Carmel misconstrues the trial court's decision, which considers much more than the mere fact that the parties entered into an agreement containing a restrictive covenant. While not expressly identifying its discussion as such, the trial court's analysis includes significant consideration as to whether Dr. Clark has any legitimate interest in need of protection by enforcement of the restrictive covenant or whether he will suffer irreparable harm if the covenant is not enforced. Similarly, the trial court affords due consideration to whether enforcement of the covenant would impose an undue hardship on Mount Carmel.

Mount Carmel is, however, correct in its contention that the trial court's analysis does not contain any consideration of the third prong of the *Raimonde* test, *i.e.*, whether enforcement of the covenant would be injurious to the public. The trial court's failure to consider this factor does not, however, require reversal

of the decision. This court reviews the trial court's grant of summary judgment *de novo*, *i.e.*, we must review the judgment independently and without deference to the trial court's determination. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153, 1157–1158. Thus, it was this court's obligation to independently review the summary judgment materials submitted by both parties and to determine, after construing those materials in a light most favorable to Mount Carmel, whether summary judgment is appropriate. Having considered in our discussion of the third assignment of error all three prongs of the *Raimonde* test, as well as the standard for granting injunctive relief, and having concluded that there is no genuine issue as to any material fact, that Dr. Clark is entitled to judgment as a matter of law, and that reasonable minds can come to but one conclusion, which is adverse to Mount Carmel, we find that the trial court's failure to consider the third prong of the *Raimonde* test does not require reversal of the decision. Accordingly, Mount Carmel's first and second assignments of error are not well taken.

For the foregoing reasons, Mount Carmel's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

DESHLER and CLOSE, JJ., concur.