**LIFE LINE SCREENING OF AMERICA, LTD., Plaintiff,**

v.

**CALGER et al., Defendants.**

2006-Ohio-7322.]

Court of Common Pleas of Ohio,
Cuyahoga County.

No. CV 06 580982.

Decided June 19, 2006.

8

10

Cavitch, Familo, Durkin, & Frutkin and Michael C. Cohan, for plaintiff.

Benesch, Friedlander, Coplan, & Arnoff and Maynard A. Buck, for defendants.

---

BOYLE, Judge.

{¶ 1} This matter came before the court for oral hearing upon plaintiff Life Line Screening America, Ltd.'s January 5, 2006 motion for preliminary injunction, opposed by defendants Frank R. Calger and Melissa Calger in their February 10, 2006 brief in opposition. On March 1, 2006, the parties commenced the preliminary injunction hearing. Due to this court's criminal docket and the schedules of the attorneys, the preliminary injunction proceeding was heard over several sessions and concluded on April 5, 2006. The parties submitted exhibits, and the court heard testimony from Tim Phillips, Linda Fedor, Rena Law (Life Line Director of Clinical Operations), Dinah Vince (former Life Line Director of Clinical Operations), and Frank and Melissa Calger. After having heard and reviewed the testimony, pleadings, and evidence, the court hereby grants plaintiff's motion for preliminary injunction.

## I. PROCEDURAL HISTORY

{¶ 2} In this case, plaintiff Life Line Screening of America, Ltd. ("Life Line") seeks to enforce the terms of two identical noncompete contracts ("the agreements") entered into between Life Line and the defendants, Frank Calger and Melissa Calger. Life Line filed its verified complaint against the Calgers on January 5, 2006, in which it asserted claims of breach of contract (Count I),

misappropriation of trade secrets (Count II), and breach of the duty of loyalty (Count III). Also on January 5, Life Line filed a motion for preliminary injunction and an application for a temporary restraining order, seeking to enjoin the Calgers from (1) breaching the terms of the agreement for two years from the conclusion of this action, (2) soliciting Life Line's customers and/or employees, and (3) using Life Line's trade secrets or confidential information on behalf of any competitive entity.

{¶ 3} On January 9, 2006, the parties convened for a hearing regarding the application for a temporary restraining order. At that hearing, the court heard testimony from Life Line Executive Vice President Tim Phillips, Life Line Midwest Regional Manager Linda Fedor, and Frank and Melissa Calger. On January 13, 2006, this court issued a temporary restraining order, ordering the Calgers and Health Choice to cease providing health-screening tests in violation of the agreements. On January 31, 2006, this court extended the temporary restraining order an additional 14 days.

## II. FINDINGS OF FACT

{¶ 4} Life Line was founded in Cleveland, Ohio, in 1997 and now operates in all states except Hawaii and Alaska. Life Line provides health screenings for vascular diseases, using ultrasound technology. These screenings are designed to detect cerebrovascular disease, aortic aneurism, peripheral vascular disease, and osteoporosis. Specifically, Life Line performs four health screening tests: (1) an ultrasound scan for carotid artery stenosis, (2) an ultrasound scan for abdominal aorta aneurysm, (3) an Ankle–Brachial Index to screen for peripheral artery disease, and (4) a Bond Density scan to screen for osteoporosis.

{¶ 5} Life Line delivers its health screenings on a mobile basis, having mobile units that travel to destinations throughout communities across the continental United States. The vans are staffed with four to five employees, usually two ultrasound sonographers and two or three medical technologists. Life Line has approximately 70 such teams deployed throughout the country.

{¶ 6} Life Line offers the screenings to the public at different venues located throughout communities in which Life Line is active. The venues are often associated with community organizations—e.g., churches, whose participation has been achieved through Life Line marketing and outreach efforts. Once a site and screening date have been established, Life Line markets the event to individual participants. Life Line marketing is done largely through the distribution of flyer inserts in local print media, through direct mail, and through its website.

{¶ 7} When conducting the screenings, Life Line personnel follow screening protocols developed by the company. The protocols were developed primarily by

former Life Line Director of Clinical Operations Dinah Vince, along with significant input from consulting physicians. The protocols outline procedures whereby accurate screening results may be obtained for a participant in approximately five minutes. Use of the protocols allows Life Line to screen up to 90 persons per day at a particular site.

{¶ 8} Life Line also presented other evidence of business processes that it deems confidential and protectable. These include its methods of marketing and its operational procedures, including patient-information forms and screening logistics. Life Line also asserted that its training program, which Frank and Melissa Calger played leadership roles in, is protectable.

{¶ 9} Frank and Melissa Calger each worked at Life Line for approximately eight years. Frank was Melissa's supervisor, and they were married in 2003.

{¶ 10} Frank Calger joined Life Line in November 1997 as an ultrasound-screening technician. Mr. Calger had no prior professional experience in the field of preventive health testing, but had completed an 18–month course in diagnostic medical ultrasound at the Sanford Brown Institute in Cleveland. During his Life Line employment, Mr. Calger progressed upward, attaining the positions of team manager in Northeast Ohio and later national trainer. In the latter position, Mr. Calger estimates that he trained between 50 to 75 percent of current Life Line ultrasound technicians. Mr. Calger also became a registered vascular technologist while working at Life Line. When Mr. Calger left Life Line in April of 2005, he was among the most experienced Life Line employees and was earning over $70,000 annually.

{¶ 11} Melissa Calger also joined Life Line in 1997 after she completed the 18–month Sanford Brown course. Mrs. Calger did not have any testing experience prior to Sanford Brown. After completing her training at Sanford Brown, Mrs. Calger was employed for a few months with another testing company. Like Mr. Calger, Mrs. Calger progressed in her employment at Life Line. She was an assistant team manager (although she was usually referred to as a co-team manager) when she resigned in April 2005. She also participated in the national training program. When she resigned, Mrs. Calger was earning approximately $60,000 per year with Life Line.

{¶ 12} Since leaving Life Line, both Frank and Melissa Calger have secured full-time employment as sonographers at medical facilities in Northeast Ohio.

{¶ 13} The Calgers began to explore the option of starting their own company in October and November 2004. The Calgers testified that they sought, in part, to enjoy a more regular work schedule than they had at Life Line, and they felt they had the expertise to establish a successful health-screening business. Initially, they considered establishing a fetal imaging business, providing pregnant

women sonographic images of their fetuses. By November 2004, however, they decided to start a business directly in competition with Life Line.

{¶ 14} In November 2004, Mr. Calger told Life Line Midwest Regional Manager, Linda Fedor, that he and Mrs. Calger expected to resign from Life Line in the near term. In both November and December, Fedor asked Mr. Calger directly whether he planned to compete with Life Line. On both occasions he responded that he did not plan to do so. When the Calgers resigned in the spring of 2005, Fedor again asked Mr. Calger whether they planned to compete with Life Line, and he told her that they were unsure of their plans. Mr. Calgers' assurances were, however, contrary to the facts. The Calgers had decided to directly compete with Life Line as early as October 2004, and on February 2, 2005, they registered the trade name Health Choice Preventative Care with the Ohio Secretary of State.

{¶ 15} The Calgers left their employment at Life Line in mid-April 2005, and they had Health Choice operational by June 2005. The evidence shows that Health Choice offers the same four screening tests offered by Life Line and offers two other tests. During the summer of 2005, the Calgers began advertising Health Choice services in Northeast Ohio, using a website, newspaper flyer inserts, and a cable television commercial. The Health Choice website and advertising flyers are similar in appearance to those of Life Line, and the Health Choice advertising motto, "helping you protect your health," is similar to the Life Line motto, "Protect your health. Protect your life."

{¶ 16} The Calgers testified that the testing protocols that they employ differ "slightly" from the Life Line protocols. Whether this is true could not be tested by objective evidence because the Calgers claimed that they did not have any actual written protocols. The Health Choice customer screening documents are very similar to those employed at Life Line during the Calgers' employment. Unlike Life Line, however, Health Choice does not employ the services of reading physicians. While Life Line forwards screening results to physicians for review prior to providing customers with results and recommendations, the Calgers themselves review the test results and provide subsequent recommendations with no physician input whatsoever.

{¶ 17} The Calgers operate Health Choice from two sites, one in the eastern suburbs of Cleveland, and the other in Middleburg Heights. The Calgers initially argued to this court that their business was operated solely from those sites and that therefore their business differed significantly from Life Line, which operates a strictly mobile operation. The Calgers' attorney argued at the temporary-restraining-order hearing that the difference was determinative, and urged that the court consider reforming the agreements to preclude Health Choice from

operating a mobile screening service, but allowing Health Choice to offer screenings from fixed locations.

{¶ 18} It was brought to the attention of the court, however, that Health Choice was, in fact, offering a mobile screening on January 12, 2006. It was further revealed that Frank Calger was offering screening workshops at various locations in Northeast Ohio. Mr. Calger initially denied the latter fact, but conceded upon cross-examination that he was offering those workshops. Further,, during the course of this litigation, the Calgers have changed positions and now assert that their business will offer services from fixed sites and on a mobile basis.

## III. CONCLUSIONS OF LAW

A. Enforcement of Noncompete Agreements in Ohio

{¶ 19} An injunction is an extraordinary remedy and should be granted only if there is no adequate remedy at law. *Langley v. Fetterolf* (1993), 89 Ohio App.3d 14, 17, 623 N.E.2d 577. A party seeking a preliminary injunction pursuant to Ohio Civil Rule 65(B) "must establish a right to the preliminary injunction by showing clear and convincing evidence of each element of the claim." *Crestmont Cadillac Corp. v. Gen. Motors Corp.*, Cuyahoga App. No. 83000, 2004-Ohio-488, 2004 WL 229127, at ¶ 28.

{¶ 20} In Ohio, the elements a moving party must demonstrate by clear and convincing evidence for issuance of a preliminary injunction are: (1) a substantial likelihood of success on the merits, (2) that the moving party will suffer irreparable harm in the absence of such relief, (3) that the threatened injury to the moving party outweighs the threat of harm to others, and (4) that the requested relief will serve the public interest. *Toledo Police Patrolman's Assn., Local 10, IUPA, AFL–CIO–CLC, v. Toledo* (1998), 127 Ohio App.3d 450, 469, 713 N.E.2d 78; *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260, 273, 747 N.E.2d 268. In determining whether to grant injunctive relief, courts have recognized that no one factor is determinative. Rather, all of the factors must be balanced before reaching a decision. *Toledo Police Patrolman's Assn.*, 127 Ohio App.3d at 469, 713 N.E.2d 78.

{¶ 21} A determination of the likelihood of success on the merits requires analysis of the non-compete agreement at issue. Ohio courts have established that "restrictive covenants not to compete are disfavored by law." *Clark v. Mt. Carmel Health* (1997), 124 Ohio App.3d 308, 314, 706 N.E.2d 336. Further, a restrictive covenant will "be enforced only to the extent that the restraints imposed thereby are reasonably necessary to protect the employer's legitimate business interests." *Brentlinger Ents. v. Curran* (2001), 141 Ohio App.3d 640,

645, 752 N.E.2d 994, citing *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 25–26, 71 O.O.2d 12, 325 N.E.2d 544. More specifically, a restrictive covenant will be enforced only if the restraint (1) is required to protect the legitimate interests of the employer, (2) does not impose an undue hardship on the former employee, and (3) is not injurious to the public. *Raimonde*, 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544, syllabus; *Rogers v. Runfola & Assocs., Inc.* (1991), 57 Ohio St.3d 5, 8, 565 N.E.2d 540.

{¶ 22} Additional factors to be considered in assessing the reasonableness of a restrictive covenant include:

[t]he absence or presence of limitations as to time and space, * * * whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*Raimonde*, 42 Ohio St.2d at 25, 71 O.O.2d 12, 325 N.E.2d 544.

When a court finds a noncompete agreement to be unreasonable, the court is empowered to reform the agreement so that it is reasonable. Id. Each case involving noncompete agreements is to be decided upon its facts. Id.

B. The Reasonableness of the Life Line Agreements

{¶ 23} Under the analysis described above, the agreements between Life Line and the Calgers are reasonable and enforceable. First, the court finds that the noncompete agreements need to be enforced to protect the legitimate business interests of Life Line.

{¶ 24} Life Line has a protectable interest in the business processes and the testing protocols that have enabled it to succeed, and the Calgers have more or less copied those processes and protocols so that they may unfairly compete with Life Line. The scope of the agreements is not greater than that required to protect Life Line. Life Line's testing protocols, developed at significant cost to Life Line, enable the company to deliver potentially life-saving data in an efficient and profitable manner. For example, the protocols make it possible for Life Line to service up to 90 clients per site per day. The court also finds that Life Line has a protectable interest in its marketing strategies, methods of gathering and processing customers' data, technician training meth-

ods, and screening logistics. Frank and Melissa Calger were both active in training Life Line technicians, and Mr. Calger testified that he trained over 50 percent of current Life Line technical personnel. Ohio appellate decisions reveal that an employee's knowledge of training and quality-control systems may provide a competitor with an unfair advantage, an outcome that noncompete agreements may permissibly prevent. *Atlantic Tool & Die v. Kacic* (Nov. 18, 1998), 9th Dist. No. 2717–M, 1998 WL 801913, *3–4.

{¶ 25} The evidence showed that Health Choice has to a large degree copied significant portions of the Life Line business. Health Choice marketing materials, including its flyers, its motto, and its website, are strikingly similar to those of Life Line. Health Choice's client-information form is a near replica of Life Line's. The Calgers argued that an observant outsider could discern these business practices, and the practices are therefore neither confidential nor protectable. However, Life Line personnel, most importantly Clinical Operations Director Rena Law, testified that some of these elements, e.g., the client-information form, are kept confidential by the company. Moreover, the evidence established that Life Line engaged in a considerable amount of trial and error to develop its business, at considerable expense. Many individuals and/or companies have tried to enter this type of business and have failed, resulting in Life Line's having relatively few national competitors. The difficulty in being successful at this type of business reinforces the conclusion that Life Line's marketing processes and techniques have been successfully kept within the company and thus qualify as protectable interests sufficient to support a noncompete agreement.

{¶ 26} It is further relevant that Life Line has noncompete contracts with other employees that are similar to the Agreements at issue here. It is recognized in Ohio that an employer has a protectable interest in enforcing its non-compete agreements among remaining employees. *H.L.S. Bonding Co. v. Fox*, Franklin App. No. 03AP–150, 2004-Ohio-547, 2004 WL 232145, ¶ 17. The court finds that the impact on the noncompete agreements with remaining employees is a factor that weighs in favor of enforcement in this matter.

{¶ 27} Pursuant to the second factor under *Raimonde*, enforcement of the agreements also does not impose undue hardship upon the Calgers. The Calgers initially argued to the court that their experience with Life Line did not enhance their employment prospects, but in fact diminished them due to the narrow scope of Life Line's use of ultrasound technology. Those assertions were severely undercut during the course of the litigation by the fact that both Frank and Melissa Calger obtained full-time employment as ultrasound technicians. Indeed, the Calgers are free to engage in the ultrasound field at any hospital or

18

physician's office, and they have demonstrated the ability to obtain such employment. The Calgers' desire to be self-employed is irrelevant to this analysis. See, e.g., *Am. Logistics Group, Inc. v. Weinpert*, Cuyahoga App. No. 85041, 2005-Ohio-4809, 2005 WL 2240987, ¶ 50. Rather, it is their burden to demonstrate that the agreements prevented them from obtaining employment in their field. Id.; see also *Brentlinger Ents. v. Curran*, 141 Ohio App.3d at 652–653, 752 N.E.2d 994 (an auto salesman with a background in sales of European automobiles is not prevented from making a living under a noncompete contract that forbids selling European cars for a competitor, as he can effectively sell in the general auto market, and only a small percentage of dealers in that field are eliminated under the agreement). As has been held by Ohio courts:

> To be sure, any person who is prevented from practicing his profession or trade for a period of time in an area in which it has been practiced, suffers some hardship. However, the *Raimonde* test requires more than just some hardship * * *. Too often courts have attempted to rewrite contracts for parties that appear after the fact to be more equitable to one or more of the parties. The *Raimonde* opinion acknowledges that temptation and its test should therefore be strictly applied.

*Robert W. Clark, M.D., Inc. v. Mt. Carmel Health* (1997), 124 Ohio App.3d 308, 318, 706 N.E.2d 336, citing *Williams v. Hobbs* (1983), 9 Ohio App.3d 331, 336, 9 OBR 599, 460 N.E.2d 287 (Moyer, C.J., dissenting). Therefore, pursuant to the evidence and under Ohio law, enforcement of the agreements does not impose an undue hardship upon the Calgers.

{¶ 28} The third factor under *Raimonde* requires an analysis of whether the agreements are injurious to the public. As a rule, Ohio law finds the enforcement of contractual obligations to be of itself an important social policy interest. *Blakeman's Valley Office Equip. v. Bierdeman*, 152 Ohio App.3d 86, 93, 2003-Ohio-1074, 786 N.E.2d 914; *UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.* (2001), 147 Ohio App.3d 382, 397, 770 N.E.2d 1068. Further, courts analyze this factor in the event that non-compete agreements are engaged to further a monopoly. *C.A. Litzler Co. v. Libby* (Aug. 12, 1991), Stark App. No. CA–8512, 1991 WL 160850. Here, Life Line currently does not have direct competition locally, but given the low barriers to entry in the screening business (the Calgers appear to have started Health Choice with minimal investment) and the existence of national competitors, the agreements cannot be said to be furthering a monopoly.

{¶ 29} Additionally relevant is the fact that the Calgers not only are in breach of their agreements, but were deceptive in breaching the agreements. The testimony of Life Line employees and Mr. Calger himself showed that on at least two occasions Mr. Calger was not forthright when asked about his intentions to

establish a competitive business. It is clearly not in the interest of the public to encourage such conduct by allowing it to serve as a basis to break a noncompete agreement.

{¶ 30} Upon applying the additional factors under *Raimonde*, the court does not find reformation of the agreements necessary. First, after consideration of the facts and circumstances particular to this matter, i.e., nature of business, employment, etc., the court finds that the two-year period specified in the agreements is reasonable. Numerous Ohio decisions have upheld contracts calling for two-year periods or longer.[1] Life Line Vice President Tim Phillips testified that the company arrived at two years based upon what it felt to be a fair amount of time for an employee to refrain from using Life Line's confidential information in a competitive fashion. He indicated that this would level the playing field. The Calgers assert that there is no specific calculation in support of the two-year period, and that, therefore, it is unreasonable. The Court rejects the Calgers' view that there must be a defensibly precise calculation underlying the time period. What is required is a "reasonable relationship" between the period of prohibition and Life Line's business interests. *S & S, Inc. v. Kuret* (May 13, 1993), Cuyahoga App. Nos. 62478 and 63042, 1993 WL 158238, *2.

{¶ 31} Here, in light of the amount of experience and training that Life Line provided the Calgers over approximately eight years, and the significant level of funding and risk that the Life Line founders undertook to develop the business processes and testing protocols that the Calgers seek to utilize, two years is not unreasonable. Further, the Ohio cases holding two years or more to be reasonable, cited above, do not demand the level of precise calculations that the Calgers seek to require.

{¶ 32} The parties differ most strongly on the factor inquiring as to whether the Calgers possessed confidential information or trade secrets. The court notes that this factor is not dispositive, but is merely one of the factors to be considered. Nevertheless, the court finds that the Calgers did possess confidential information that will be unfairly used to the detriment of Life Line if the agreements are not enforced. The court finds that the Life Line screening protocols are unique, that they were developed by the company at significant expense, and that they are distinguishable from publicly available diagnostic-

---

1. *Frederick D. Harris, M.D., Inc. v. Univ. Hosp. of Cleveland* (Mar. 7, 2002), Cuyahoga App. Nos. 76724 and 76785, 2002 WL 363593, *4 (two years is a reasonable period); *Parma Internatl., Inc. v. Herman* (Feb. 16, 1989), Cuyahoga App. No. 54243, 1989 WL 12928, *2–3 (five years is reasonable); *Raimonde*, 42 Ohio St.2d at 28, 325 N.E.2d 544 (upholding three-year limitation); *Wall v. Firelands Radiology, Inc.* (1995), 106 Ohio App.3d 313, 331, 666 N.E.2d 235 (three-year limitation permitted); *Neer v. Clark* (Dec. 23, 1993), Sandusky App. No. S–93–1, 1993 WL 496699, *2 (three-year limitation permitted).

testing protocols. Notwithstanding the Calgers' assertions, the court was provided with no evidence of available screening protocols that mirror those developed by Life Line. All of the available protocols that the Calgers offered as evidence pertain to diagnostic screening. The evidence showed that diagnostic testing requires significantly more data than screening, which seeks only to highlight broad indicia of vascular health. A diagnostic sonography screening requires approximately 45 minutes to complete, whereas Life Line's health-screening protocols allow a test to be done in five minutes or less. Former Life Line employee Dinah Vince, in particular, testified that the screening protocols may not be developed by simple extraction of processes from diagnostic protocols, but require independent development of target data and technical procedures.

{¶ 33} Frank and Melissa Calger testified that approximately 20 student interns from the Sanford Brown Institute had access to the protocols and that those students in fact learned the protocols, thus removing any cloak of confidentiality. Dinah Vince, however, contradicted that testimony, stating that Sanford Brown students were not capable of doing more than observing, that they would not have actually executed the more difficult protocols, and that any exposure they had would not have enabled them to leave Life Line with meaningful knowledge of the protocols. Vince's lack of current interest, coupled with the Calgers' lack of truthfulness regarding other matters in this controversy,[2] leads the court to credit the veracity of Vince's testimony regarding the Sanford Brown students. This court, therefore, finds that any exposure that Sanford Brown students had to the protocols did not diminish their confidential nature.

{¶ 34} Life Line also presented evidence that it had taken steps to protect the confidentiality of the protocols through nondisclosure agreements with its employees and contracted physicians. Rena Law testified that new employees were not permitted to access the protocols until they had executed nondisclosure and noncompete agreements.

{¶ 35} The Calgers argued at length that the agreements do not protect trade secrets because Life Line does not have trade secrets. Whether this is true or false is not dispositive. The *Raimonde* factor calls for an analysis of whether the employee was possessed with confidential information or trade secrets. Trade secrets do not generally require protection under contracts, as

---

2. Instances of Mr. Calger's lack of candor include the following: (1) he provided deceptive statements to Linda Fedor regarding plans for competing with Life Line, (2) he testified at the temporary restraining order hearing that he did not conduct off-site workshops, when in fact he did conduct such workshops, (3) he claimed early in this litigation that Health Choice operated as a fixed-site business only, when plans for mobile operations were clearly under way, (4) he claimed that he did not use Life Line practices to start Health Choice, but looked to available information from competing companies for information. Under cross-examination, however, Mr. Calger could not name any of those competing companies.

they are protected by statute. R.C. 1333.61 et seq.; *Toledo Clutch & Brake Serv., Inc. v. Childers* (Feb. 28, 1986), Lucas App. No. L–85–069, 1986 WL 2683. Confidential information, on the other hand, is not precisely defined under Ohio law, but has been described as " 'known only to a limited few; not publicly disseminated.' " *Procter & Gamble v. Stoneham,* (2000), 140 Ohio App.3d 260, 272, 747 N.E.2d 268, quoting Webster's Third New International Dictionary (1981) 476. However defined, confidential information need not meet the stringent requirements of a trade secret to be subject of a valid nondisclosure agreement.

{¶ 36} Information may be considered confidential even when the raw data that composes the information can be gathered from independent sources. Often, public access to the data that compose information is not determinative as to confidentiality. Rather, it is the analysis and interpretation of the data that gives rise to protectable and confidential information. *Stoneham,* 140 Ohio App.3d at 277, 747 N.E.2d 268. Although this analysis has often been applied to customer lists, the logic holds true for any information that is fundamental to a company's competitive success. The analysis turns not on the availability of data, but upon the question of whether the company has added value through analysis, interpretation, assembly, and development of additional information. See, e.g., *Stoneham,* 140 Ohio App.3d at 273, 747 N.E.2d 268; *Giovinazzi v. Chapman* (Aug. 26, 1982), Cuyahoga App. No. 44241, 1982 WL 5913, *2–3. Here, even if Life Line screening protocols may be distilled from available diagnostic protocols, Life Line demonstrated that its protocols were developed through great effort and investment.

{¶ 37} The Calgers further argue that a noncompete agreement can be valid under Ohio law only if the employee had significant customer contacts or was in possession of proven trade secrets. That is not an accurate statement of Ohio law, and the court rejects it. Whether a company has a protectable interest sufficient to support a noncompete agreement, as discussed in the leading Ohio Supreme Court cases, requires a broader analysis, and this court has made such an analysis. Because the Calgers are using testing protocols of Life Line and also appear to have copied other elements of Life Line's business, such as marketing strategies, patient-evaluation forms, and processes, the agreements eliminate unfair competition, and do not limit "ordinary" competition.

{¶ 38} The court has also examined the issue of whether the agreements seek to stifle the inherent skill and experience of the Calgers. The Calgers have asserted that they came to Life Line with their present skills in place and that all they learned from their Life Line experience were some peripheral administrative practices. The court does not find this assertion to be credible. Dinah Vince

testified at length as to the level of training provided to all technicians, and to the Calgers in particular. It was Vince's testimony that Life Line provided months of intensive training before the Calgers were proficient as technicians. Further, Frank Calger testified as to the high level of effort that was required of him as a trainer to provide recent sonography-school graduates with proficiency. The Calgers acquired all of their practical experience and skill at Life Line.

{¶ 39} In a leading Ohio case, *Rogers v. Runfola & Assocs., Inc.*, 57 Ohio St.3d 5, 565 N.E.2d 540, the employee court reporters, like the Calgers, argued that their educational training provided a complete set of skills. The Supreme Court of Ohio disagreed, stating that despite the educational training, the employer "played a large role in [the employees'] development as successful court reporters." Id. at 8, 565 N.E.2d 540. The court further found relevant the employer's extensive investment in "equipment, facilities, support staff and training," much of which "inured to the benefit of the [employees]." Id.

{¶ 40} Like the employer in *Rogers*, Life Line invested significantly in the professional development of the competitors. The Calgers' view to the contrary is directly contradicted by the evidence, and the notion that an 18-month course in sonography would render eight years of professional training and application insignificant is not credible. Similarly, the suggestion that a person coming out of a vocational school, with no practical experience, is fully capable and qualified as an expert in that field is not credible.

{¶ 41} The final factor to be considered here is whether the agreements provide a benefit to Life Line that is disproportionate to the detriment suffered by the Calgers. The Calgers have demonstrated that they can gain full-time employment as sonography technicians, and the two-year hiatus from initiating a screening business will not significantly impact their future prospects. Life Line, on the other hand, seeks to protect the basis of its business model and also has significant risk of loss if other employees choose to violate their noncompete agreements as a result of the Calgers' avoiding their contractual responsibilities. The court, therefore, finds that the benefit to Life Line is not disproportionate to the detriment suffered by the Calgers.

{¶ 42} Based on the court's analysis of the *Raimonde* factors, the court finds that Life Line has shown by clear and convincing evidence that there is a substantial likelihood of success as to the merits of its claims here. Thus, the court must now turn to the remaining requirements for issuance of a preliminary injunction.

C. The Remaining Preliminary Injunction Requirements.

{¶ 43} First, the court finds, as explained above, that Life Line will suffer irreparable injury if the injunction is not granted. Irreparable harm

(injury) is harm for which there is no plain, adequate, and complete remedy at law and for which money damages would be impossible, difficult, or incomplete. *Cleveland v. Cleveland Elec. Illum. Co.* (1996), 115 Ohio App.3d 1, 14, 684 N.E.2d 343. Under Ohio law, a moving party need not demonstrate evidence of actual harm, as a threat is a sufficient basis on which to grant injunctive relief. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d at 274, 747 N.E.2d 268. Moreover, the Ohio Courts have held, " '[w]hen there is a strong likelihood of success on the merits, preliminary injunctive relief may be justified even though plaintiff's case for irreparable injury may be weak. In other words, what plaintiff must show as to the degree of irreparable harm varies inversely with what plaintiff demonstrates as to its likelihood of success on the merits.' " *Mike McGarry & Sons, Inc. v. Gross*, Cuyahoga App. No. 86603, 2006-Ohio-1759, 2006 WL 895094, quoting *Cleveland v. Cleveland Elec. Illum. Co.*, 115 Ohio App.3d at 14, 684 N.E.2d 343.

{¶ 44} As evidenced in detail above, Life Line has shown a substantial likelihood of success on the merits of its claims—i.e., the Calgers are in possession of proprietary and confidential information regarding Life Line's business processes and protocols, and there is a significant threat that the Calgers will use those elements to the competitive detriment of Life Line. Therefore, Life Line has shown a definite threat of harm. Further, no evidence has been presented showing calculable money damages suffered by Life Line. Consequently, the court finds that any money damages would be impossible, difficult, or incomplete, and thus unascertainable.

{¶ 45} Second, third parties will not be unjustifiably harmed by the granting of injunctive relief. No evidence has been presented in this matter to indicate such harm, and the court finds no basis to find the existence of harm to third parties.

{¶ 46} Finally, as discussed above, the public interest is served when contractual commitments are honored. Further, the public interest is at risk when parties benefit from dishonest and unfair dealing, as the Calgers seek to do.

## IV. CONCLUSION

{¶ 47} For the reasons provided above, the court finds that Life Line has established by clear and convincing evidence that there is a substantial likelihood that it will prevail on the merits of its case, that Life Line will suffer irreparable injury if the injunction is not granted, that third parties will not be harmed unjustifiably if the injunction is granted, and that the public interest will be served by the injunction. The court finds the noncompete agreements at issue in this matter to be reasonable and enforceable. Therefore, the court grants the

plaintiff's request for a preliminary injunction, which shall remain in force until the conclusion of trial in this matter.

So ordered.