## PATIO ENCLOSURES, INC., Plaintiff–Appellant,

v.

## Mark W. HERBST, Defendant– Appellee.

No. 01–3674.

United States Court of Appeals, Sixth Circuit.

July 10, 2002.

Before DAVID A. NELSON, SILER, and CLAY, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

This is an appeal from an order denying a preliminary injunction sought by the plaintiff company in a dispute with a former employee who is claimed to have misused trade secrets and to have violated a covenant not to compete. Concluding that the findings of fact on which the district court based its decision are not clearly erroneous, and concluding further that the court's denial of interlocutory injunctive relief does not represent an abuse of discretion, we shall affirm the challenged order.

### I

The plaintiff, Patio Enclosures, Inc., is an Ohio corporation that manufactures, sells, and installs sunrooms. The defendant, Mark Herbst, began working for Patio Enclosures as a salesman in Boston, Massachusetts, on January 31, 2000. Herbst came to Patio Enclosures with 18 years of experience in the home improvement area, including 11 years in which he sold sunrooms and other improvements as a self-employed home remodeler.

As a condition of his employment with Patio Enclosures, Herbst was required to sign a "Non–Competition and Confidentiality Agreement." Under the terms of this agreement he promised not to reveal any information considered confidential, including "information relating to marketing techniques; advertising scheduling and media mix; pricing, sales, installation; manufacturing; office and personnel policies and procedures; training programs; computer software; and technical product information . . . ."

The agreement also contained clauses intended to prevent Mr. Herbst from competing with Patio Enclosures during and after his employment. In this connection he was required to give the following assurances, among others:

"5. While employed by the Company and for a period of two (2) years after my employment with the Company ends, I will not, directly or indirectly, own, operate, be employed by or have any interest in any business that sells, offers for sale, licenses or franchises others to sell any Three–Season Enclosures, Year–Round Enclosures, or Solariums which does business or is located within fifty (50) linear miles of any showroom or other business location of (i) the Company, (ii) any Franchise, (iii) any Dealer.

6. For a period of two (2) years after my employment with the Company ends, I will not, directly or indirectly:

A. Contact, for the purpose of selling any Three–Season Enclosure, Year–Round Enclosure or Solarium, (i) any customer or potential customer of the Company, its Franchises or its Dealers . . . ."

According to testimony that Mr. Herbst was to give at the hearing on Patio Enclosures' preliminary injunction application, Herbst began calling on prospective customers almost immediately after he was hired. He received some product information first, Herbst testified, but little formal training. He was also given a sales training manual and a book containing retail prices.

Herbst testified that he showed this pricing book to customers. As for other pricing information, Mr. Herbst explained that he knew his employer's "par price"— the price the company hoped actually to receive, net of any percentage that Herbst might add for himself. Herbst denied any knowledge of Patio Enclosures' costs or profit margins.

The district court characterized Herbst as a "born salesman" who "needed little instruction." In fact, Herbst broke a com-

pany-wide monthly sales record only three months after he began working for Patio Enclosures. His sales became somewhat sporadic thereafter, however, and his driver's license was revoked in December of 2000—a development that complicated the task of making sales calls. On March 28, 2001, branch manager John Hulme fired Mr. Herbst for skipping company meetings and failing to keep appointments with customers.

Shortly before his discharge Mr. Herbst had attended home shows where he obtained a total of 108 sales leads. Mindful of this fact, no doubt, Hulme cautioned Herbst at the time of the discharge that he was subject to a non-compete agreement. Hulme also requested the return of all of Patio Enclosures' confidential information, including sales lead cards. Herbst substantially complied with this request four days later, except that he had misplaced a policy and procedures handbook and did not return it until later.

Meanwhile, on March 30, 2001, Mr. Herbst had a job interview with John Esler, the President of Patio Rooms of America, doing business as Better Living Patio Rooms. Better Living, as we shall call it, also sells sunrooms.

During the job interview, Mr. Herbst mentioned his non-compete agreement with Patio Enclosures. The agreement apparently was not viewed as problematic; three days later, Esler made Herbst an offer of employment that included a $10,000 signing bonus.

A condition of the offer was that Herbst come to Better Living "as naked as a baby," clothed with no information about Patio Enclosures that might create a conflict. Herbst would also be required to sign a non-compete agreement with Better Living, although Esler said he would not have to honor it. Herbst accepted Better Living's offer. This lawsuit soon followed.

Patio Enclosures filed its suit in the Court of Common Pleas of Summit County, Ohio, where it obtained a temporary restraining order. Mr. Herbst promptly removed the case to the United States District Court for the Northern District of Ohio on the basis of diversity of citizenship and the amount in controversy.

As we have indicated, the district court was asked to issue a preliminary injunction against Mr. Herbst. The purpose of the requested injunction was to restrain Herbst from continuing his employment with Better Living and prevent him from revealing Patio Enclosures' trade secrets.

The court held an evidentiary hearing on the preliminary injunction motion. Pursuant to Fed.R.Civ.P. 65(a)(2), in cases of this sort, the trial on the merits is often advanced and consolidated with the hearing on the application for a preliminary injunction. That was not done in this instance, and only the motion for a preliminary injunction has been disposed of at this point.

At the preliminary injunction hearing Mr. Hulme testified that Patio Enclosures and Better Living compete for the same customers—homeowners in Massachusetts and New Hampshire. Hulme further testified that Herbst was aware of Patio Enclosures' profit margins and could use this information to underbid his former employer. Although Mr. Hulme admitted that customer leads go stale after a couple of months, he expressed the opinion that an abnormally large number of appointments arranged by Mr. Herbst while still employed by Patio Enclosures had been canceled after the discharge. Hulme was able to identify only one sale, however, that Patio Enclosures had demonstrably lost.

Two other employees of Patio Enclosures proved unable to quantify the company's alleged losses. The district court

discounted their assertions that Patio Enclosures' sales decreased in some unspecified amount as a result of the loss of referrals that ordinarily come from completed jobs.

The district court credited testimony by Mr. Esler that Better Living did not compete with Patio Enclosures. Mr. Esler testified that his company was not in competition with the plaintiff because the two companies use different marketing methods. Whereas Patio Enclosures' advertising budget is primarily spent on print media and home shows, Esler explained that about 90 percent of Better Living's leads come from short television commercials.

Because of the different emphasis in marketing techniques, Mr. Esler said, he rarely encountered customer overlap with Patio Enclosures. He estimated that during the two years Patio Enclosures had been in business in north Boston, Better Living had only directly competed with the plaintiff three percent of the time.

At the end of the hearing the district court denied the request for a preliminary injunction. The court found that the plaintiff had failed to show a strong likelihood of success on the merits of both its non-compete and trade secrets claims, had failed to show a threat of irreparable injury, and had failed to show damage to the public interest. The plaintiff timely appealed the ruling to this court.

## II

A trial court is to consider four factors in deciding whether to issue a preliminary injunction:

> "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a prelim-

inary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir.2000) (citations omitted).

Although the four factors must be balanced, the demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction. *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir.1982). And a preliminary injunction is an extraordinary remedy that should only be granted when the movant carries its burden of persuasion. *Leary*, 228 F.3d at 739.

We apply an "abuse of discretion" standard in reviewing the district court's decision. *Leary*, 228 F.3d at 736. The district court's "weighing and balancing of the equities" is rarely overruled, and the court's factual findings are binding on us unless clearly erroneous. *Id.* We must be cautious about setting aside the credibility determinations of a judge who has had the opportunity to view the witnesses on the stand and assess their demeanor while testifying. *Peveler v. United States*, 269 F.3d 693, 702 (6th Cir.2001)(citing *Ramsey v. United Mine Workers of America*, 481 F.2d 742, 747 (6th Cir.1973)).

## III

### A. Likelihood of Success on the Merits

#### 1. Reasonableness of the Non–Compete Agreement

The district court found the non-compete agreement unreasonable, and the plaintiff contends that the court erred in so doing. The covenant was limited geographically and temporally, the plaintiff argues, and it was narrowly tailored to prevent only unfair competition by prohibiting the defendant from accepting employment as a sunroom salesman for a direct competitor.

A non-compete agreement is considered reasonable, under Ohio law, if three condi-

tions are met: (1) it goes no further than necessary to protect the legitimate interests of the employer; (2) it does not impose undue hardships on the employee; and (3) it is not injurious to the public. *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544, 547 (Ohio 1975).[1] Each of these elements must be established by clear and convincing evidence. *Clark v. Mt. Carmel Health*, 124 Ohio App.3d 308, 706 N.E.2d 336, 339 (1997). In the case at bar the district court concluded that the plaintiff was not likely to be able to make the required showing, and thus did not have a strong likelihood of succeeding on the merits of its claim to enforce the non-compete agreement.

■ The district court's determination was largely based on its conclusion that the non-compete agreement was more restrictive than necessary to protect the plaintiff's business interests. The court offered several reasons for this conclusion. First, the court noted that the plaintiff's normal training procedures were not followed with respect to the defendant. The court also found credible the testimony that Herbst's success as a salesman resulted from his natural abilities. And the court accepted Mr. Esler's argument that Better Living and the plaintiff rarely compete for the same customers. Although the court conceded that the plaintiff's customer leads were confidential, it found no evidence either that the defendant had

used these leads after March 28 or that potential customers had canceled their appointments because of Better Living. Neither did the court see any realistic likelihood that Mr. Herbst would be using the plaintiff's customer leads in the future.

Addressing the second *Raimonde* factor, the district court found that the non-compete agreement was unreasonable because it unduly harmed the defendant. The court considered Mr. Herbst a talented salesman who had independently cultivated his abilities. An agreement that essentially required him to move to another state to continue selling the product with which he was most familiar did not strike the court as reasonable. We cannot say that this judgment reflects an abuse of discretion.

## 2. Trade Secrets Claim

Under Ohio law, an actual or threatened misappropriation of trade secrets may be enjoined. OHIO REV. CODE ANN. § 1333.62 (2002). The plaintiff's pricing and engineering of its sunrooms constitute trade secrets under Ohio's definition of that term. See OHIO REV. CODE ANN. § 1333.61(D) (2002). Here, however, the district court was unconvinced by the plaintiff's claim of an actual or threatened misappropriation of its trade secrets.

■ First, the court pointed out that pricing was the only valuable confidential

---

1. Prior to enumerating these three basic conditions, the *Raimonde* court also provided a long list of factors to be considered when determining reasonableness in the context of employee covenants. These factors, as we have explained elsewhere, include: "whether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is dispro-

portionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir.1992) (citing *Raimonde*, 325 N.E.2d. at 547). *Raimonde* compressed this lengthy list into the three factors quoted above. See *id.* The three-factor analysis has been used in subsequent Ohio cases. See, *e.g., Clark*, 706 N.E.2d at 340.

information to which the defendant had access. The court explained that although the defendant knew the plaintiff's par prices, there was no showing of an unfair competitive advantage—for there was no evidence that the defendant was authorized to alter the prices of Better Living's products in order to underbid the plaintiff. The district court found as a fact, moreover, that the defendant did not know the plaintiff's manufacturing costs. Noting that the defendant had returned all of his Patio Enclosures materials, the court accepted as true Mr. Esler's testimony that his company did not receive any trade secrets from the defendant. Again, we have no basis for rejecting the court's findings as clearly erroneous.

The plaintiff nonetheless maintains that the "inevitable disclosure rule" establishes a threat of misappropriation. According to this rule, "a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Procter & Gamble Co. v. Stoneham,* 140 Ohio App.3d 260, 747 N.E.2d 268, 279 (Ohio Ct.App.2000).

Contrary to the plaintiff's contention, we do not think the district court improperly disregarded the inevitable disclosure rule. The court simply found the rule inapplicable on the facts presented. We agree, given the district court's findings (a) that the defendant did not possess any useful trade secrets that could create an actual threat of injury; and (b) that Patio Enclosures was not generally in competition with Better Living for the same customers.

**B. Irreparable Injury**

To be granted an injunction, the "plaintiff must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury." *Clark,* 706 N.E.2d at 339. Here the district court concluded that there had been no demonstration that the plaintiff could suffer irreparable injury absent a preliminary injunction.

We agree. As for the trade secrets claim, it is true that "[t]he existence of an actual threat of irreparable injury may be established by showing that the employee possessed knowledge of the employer's trade secrets." *Levine v. Beckman,* 48 Ohio App.3d 24, 548 N.E.2d 267, 270–271 (1988) (citation omitted). In the instant case, however, for the same reasons that the district found the plaintiff unlikely to succeed on the merits of its trade secrets claim, the court found that any knowledge of the plaintiff's trade secrets that the defendant may have had was not useful. This finding was not clearly erroneous.

The district court further determined that the plaintiff would suffer no irreparable injury if the defendant continued working for Better Living. This determination too was consistent with the evidence. The plaintiff's witnesses could not quantify the harm Patio Enclosures would suffer in the absence of an injunction, and we agree with the district court that the one sale the plaintiff lost to Better Living is not sufficient proof of irreparable injury. As the district court pointed out, Better Living could have also obtained that customer's name at the trade show.

The court also found that given their short shelf life, any leads Mr. Herbst might have kept would be useless to him at Better Living. Lastly, the district court determined that the plaintiff could not show a significant loss of referral business due to the defendant's new employment,

the testimony having demonstrated that referrals depend on a customer's experience with the sunroom installer, not the salesperson. We see nothing clearly erroneous about these findings either.

The plaintiff argues that the express terms of Herbst's non-compete agreement contain a stipulation that any violation of the agreement would create irreparable harm. See section 7 of the agreement, the first sentence of which provides as follows: "I am aware that my violation of this Agreement will cause the Company irreparable harm." Actual injury usually is not presumed, however; it must be proved. *Levine,* 548 N.E.2d at 271. Here, in our view, it was not.

C. Harm to Others and the Public Interest

In its balancing of the four factors involved in the decision whether to grant a preliminary injunction, the district court underweighted factors three and four, "substantial harm to others" and "public interest." This was entirely appropriate. The court's decision had no appreciable impact on strangers to the litigation, and while the public generally may have an interest in seeing that reasonable non-compete covenants are enforced, the court determined in this instance that the public interest would best be served by allowing a successful salesman to continue performing his trade. The plaintiff has not challenged that determination on appeal.

IV

The plaintiff contends that the district court's decision was based on an erroneous premise: that covenants not to compete are disfavored by Ohio law. The plaintiff further contends that even if the non-compete agreement was unreasonable, it should have been enforced anyway to the extent necessary to protect Patio Enclosures' legitimate business interests. See

*Basicomputer,* 973 F.2d at 512 (citing *Raimonde,* 325 N.E.2d at 547).

We agree that the district court entertained a more negative view of non-compete agreements than is justified by Ohio law. In support of its position that covenants not to compete are disfavored under Ohio law, the district court cited two cases: *Clark v. Mt. Carmel Health,* 706 N.E.2d at 340, and *Ohio Urology, Inc. v. Poll,* 72 Ohio App.3d 446, 452, 594 N.E.2d 1027, 1031 (1991). Although these decisions did contain general language along the lines indicated, they also explained that restrictive covenants are not *per se* unenforceable and can be enforced if reasonable. See *id.* And reasonableness is to be determined under the *Raimonde* factors. The upshot, as stated in *Procter & Gamble,* 747 N.E.2d at 275, is that "non-compete agreements that are reasonable are enforced, and those that are unreasonable are 'enforced to the extent necessary to protect an employer's legitimate interest.'" (Citations omitted.)

This having been said, we remain unconvinced that the district court committed reversible error in declining to partially enforce the non-compete agreement. It is true that the agreement was enforceable to the extent necessary to protect Patio Enclosures' legitimate interests. But the district court clearly was of the view that the plaintiff had no legitimate business interests that needed protection. That is not an untenable view, in our opinion—which means that the district court had no obligation to enforce the covenant even in part.

**AFFIRMED.**