NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0372n.06

No. 12-4558

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Apr 15, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| FIRSTENERGY SOLUTIONS CORP., | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| PAUL FLERICK, | ) | |
| | ) | O P I N I O N |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:  McKEAGUE and DONALD, Circuit Judges; and LAWSON, District Judge.[*]

**McKEAGUE, Circuit Judge.**  Paul Flerick resigned his position at FirstEnergy Solutions Corporation and immediately went to work for a competitor company.  By so doing, he violated the terms of the noncompete clause in his employment agreement that restricted him from directly competing with FirstEnergy for a period of one year after the termination of his employment.  The district court granted FirstEnergy's motion for a preliminary injunction and enjoined Flerick from violating his noncompete clause.  We affirm.

## I.  BACKGROUND

Flerick is a salesman and has worked in the natural gas and electric energy industries for well over 20 years.  In October 2009, Flerick began working for FirstEnergy as a "major account

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

executive"—a mid-level sales position. FirstEnergy is an energy supplier based in Ohio that supplies electricity to customers located in Illinois, Maryland, Michigan, New Jersey, Ohio, and Pennsylvania.

As a condition of his employment, Flerick signed an employment agreement containing a noncompete clause that read in relevant part as follows:

> 4.1    During the term of his employment with FirstEnergy and for a period of twelve (12) months following the termination of his employment for any reason, including without limitation, termination by mutual agreement, Employee expressly covenants and agrees that he will not, within the following geographic region: Ohio, Michigan, Illinois, Pennsylvania, New Jersey, Maryland, provide electric commodity sales services at any time for himself or on behalf of any other person, firm, association or other entity:
>
>> (A) Participate or engage, directly or indirectly, in the business of selling, servicing, manufacturing and/or purchasing products, supplies or services of the kind, nature or description of those sold by Employee for FirstEnergy, except pursuant to his employment with FirstEnergy;
>
> . . . .

R. 1-2, Employment Agreement, PageID # 15.

While negotiating the terms of his employment with FirstEnergy, Flerick expressed some concerns about the noncompete clause. He suggested a revision that would allow him to work for a competitor after leaving FirstEnergy as long as he did not directly contact FirstEnergy's customers. FirstEnergy refused to revise the agreement, telling him that it was a "[c]ondition of hire." R. 41, Hearing Tr. PageID # 974. Flerick eventually capitulated and signed the agreement.

Flerick was assigned to the company's large commercial and industrial sales group, which served customers requiring high volumes of electricity. He worked from his home in Illinois.

Flerick sold electricity both directly to the end users and indirectly through agents and brokers. He received lists of prospective customers from FirstEnergy, at least some of which were compiled by third parties through a subscription service. After identifying a prospective customer, either directly or through an agent, Flerick would send the customer's information to FirstEnergy's pricing department, and based on the price they specified, he would submit a proposal to the potential customer. Flerick focused his sales efforts in Illinois, but he also closed sales in all the other states FirstEnergy supplied except Michigan. One of his largest sales was to the Ohio locations of a company called Duke Realty. He had established a relationship with Duke Realty's Illinois locations in 2006, before he began working for FirstEnergy. This sale allowed him to double his performance goals in 2010.

Flerick was successful at his job at first, but his performance soon began to lag. His 2011 year-end performance evaluation indicated that he had fallen short of his performance goals for that year. Beginning in April 2010, FirstEnergy had begun assigning Flerick's agents to other sales personnel. Flerick believed that this loss of agents, along with lack of marketing support and an uncompetitive price, contributed to his lackluster performance. About a week after his negative review, he learned that he would be placed on a performance improvement plan, a ninety-day program designed to help employees improve their performance. If an employee in the program failed to meet the program's objectives, he could be terminated.

In early 2012, about the same time he was placed on the performance improvement plan, Flerick and two others were transferred from the large commercial and industrial sales group to FirstEnergy's government aggregation sales group, which sold electricity to municipalities. The

Illinois market targeted by the government aggregation group had opened up significantly around that time, and the group needed additional personnel. Sales personnel from an Ohio market, which had calmed down, were able to reconcentrate their efforts in Illinois and cover Flerick's responsibilities.

Within a few weeks of receiving his negative evaluation, Flerick initiated discussions about a potential position with Reliant Energy Retail Services, LLC, one of FirstEnergy's competitors. Shortly before starting his job with FirstEnergy, Flerick had worked with some of the personnel at Reliant, and they "were familiar with [his] track record." R. 42, Hearing Tr. PageID # 1056. He sent Reliant a copy of his noncompete clause, and Reliant informed him it was unenforceable.

On April 23, 2012, Flerick submitted a letter of resignation to FirstEnergy. A supervisor reminded him about his noncompete clause, and Flerick indicated that it would not be an issue. When asked about his plans, he declined to provide any information. Flerick was required to and did return all company-issued electronic devices and all company documents.

FirstEnergy first learned in October 2012 that Flerick was working for Reliant. FirstEnergy's in-house attorney sent Flerick a cease-and-desist letter on October 23. Reliant's counsel replied and indicated that Flerick did not possess any confidential information, had not solicited any customers to whom he sold electricity in the year before he left FirstEnergy, and that the provision prohibiting Flerick from working for a competitor was overly broad and unenforceable.

FirstEnergy sued Flerick for breach of contract in the United States District Court for the Northern District of Ohio on November 29, seeking injunctive relief and damages. It also filed a motion for a temporary restraining order enjoining Flerick from competing with FirstEnergy within

the geographic region specified in the noncompete clause.  The district court held a hearing on the motion on December 3.  It granted the motion in part, but limited the geographic reach of the temporary restraining order to Illinois.

The temporary restraining order expired on December 18.  On December 17, FirstEnergy filed a motion for a preliminary injunction.  On December 18 and 19, the district court held a hearing on the motion.  Flerick and two of his former supervisors at FirstEnergy testified.  On December 20, the district court granted FirstEnergy's motion for a preliminary injunction, enjoining Flerick from competing with FirstEnergy in any of the six states it does business through May 7, 2013.  Flerick timely appealed this order.

On December 21, FirstEnergy filed an amended complaint adding counts against Reliant for tortious interference and theft of trade secrets.  Flerick filed a motion to dismiss based on lack of subject matter jurisdiction for failure to satisfy the amount-in-controversy requirement.  That motion remains pending.

## II.  ANALYSIS

### A.  Jurisdiction

The district court's jurisdiction over this case was based on diversity of citizenship (Flerick is a citizen of Illinois and FirstEnergy is an Ohio corporation headquartered in Ohio).  Flerick argues that the district court lacked subject matter jurisdiction because FirstEnergy cannot satisfy the amount-in-controversy requirement.  *See* 28 U.S.C. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . .").

- 5 -

Although FirstEnergy's complaint alleged that an amount over $75,000 was at stake, Flerick contends that no amount of money is at stake since none of the evidence introduced thus far has shown any monetary damages to FirstEnergy.

"A court must not dismiss an action for failure to meet the amount in controversy requirement unless it appears 'to a legal certainty that the claim is really for less than the jurisdictional amount.'" *Basicomputer Corp. v. Scott*, 973 F.2d 507, 510 (6th Cir. 1992) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)). "A complaint may reach the jurisdictional amount by including claims for losses that are difficult to quantify, such as competitive losses." *Id.* (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 348 (1977)). In *Basicomputer*, we looked to the sales formerly generated by the defendant employees as well as to the alleged competitive losses suffered by the plaintiff employer in determining whether the amount-in-controversy requirement was satisfied. *See id.*

Here, the record indicates that in the year preceding Flerick's resignation, FirstEnergy reaped over $300,000 in gross profits based on his sales. Flerick's performance goals evidently required him to produce millions of dollars in revenue each year. Based on this evidence, we cannot say to a legal certainty that FirstEnergy's claim implicates less than $75,000. The district court properly exercised diversity jurisdiction over this case.

**B. Preliminary Injunction Standard**

A district court must consider four familiar factors when deciding whether to issue a preliminary injunction: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a

preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995). These items are "factors to be balanced and *not prerequisites* that must be satisfied." *Id.* (quotation omitted). They "simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Id.* (quotation omitted).

We review a district court's decision to issue a preliminary injunction for an abuse of discretion, reviewing its factual findings for clear error and its legal conclusions de novo. *Id.* Absent a clear error of fact or an erroneous legal conclusion, "the district court's weighing and balancing of the equities is overruled only in the rarest of cases." *Id.* (quotation omitted).

With these foundational principles in mind, we address the four factors in turn.

**C. Application**

*1. Likelihood of Success on the Merits*

FirstEnergy can succeed on the merits of its claim for breach of the noncompete covenant in Flerick's employment agreement only if the covenant is enforceable. In Ohio, a noncompete covenant is enforceable to the extent it is reasonable. *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 544 (Ohio 1975) (Syllabus). "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is [1] no greater than is required for the protection of the employer, [2] does not impose undue hardship on the employee, and [3] is not injurious to the public." *Id.* (Syllabus). "The party seeking to enforce the covenant 'is required to adduce clear and convincing evidence as to each of these factors' in order to prove that the covenant is reasonable." *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir.

2007) (quoting *Levine v. Beckman*, 548 N.E.2d 267, 270 (Ohio Ct. App. 1988)). If a noncompete

covenant is unreasonable, a court can modify it to make it reasonable. *Raimonde*, 325 N.E.2d at 547.

The reasonableness of noncompete covenants is determined on a case-by-case basis. *Id.* The

three requirements just set forth are essentially a summary of a longer list of factors the Ohio

Supreme Court has directed Ohio courts to consider:

1. Whether the restriction is temporally and spatially limited;

2. Whether the employee represents the sole contact with the customer;

3. Whether the employee is possessed with confidential information or trade secrets;

4. Whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition;

5. Whether the covenant seeks to stifle the inherent skill and experience of the employee;

6. Whether the benefit to the employer is disproportional to the detriment to the employee;

7. Whether the covenant operates as a bar to the employee's sole means of support;

8. Whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and

9. Whether the forbidden employment is merely incidental to the main employment.

*Id. (*quoting *Extine v. Williamson Midwest Inc.*, 200 N.E.2d 297, 299 (Ohio 1964)); *see also*

*Basicomputer Corp.*, 973 F.2d at 512 (describing the *Raimonde* requirements as a summary of these

factors); *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 968 n.1 (6th Cir. 2002) ("*Raimonde*

compressed this lengthy list into the three factors . . . .").

Whether a noncompete covenant is reasonable is a question of law which we review de novo,

although we review the district court's factual findings for clear error. *Chicago Title*, 487 F.3d at

990. In its order granting FirstEnergy's motion for a preliminary injunction, the district court discussed each of the nine factors and concluded that FirstEnergy had proved the noncompete covenant's reasonableness by clear and convincing evidence. We find this conclusion proper.

*First*, the covenant imposes no greater restrictions than those necessary to protect FirstEnergy's legitimate business interests. The covenant contains a time limit of one year and a geographic limitation to the region where First Energy does business. Although he conducted some of his business through agents, Flerick also had direct contact with FirstEnergy's customers.

The district court found that Flerick possessed confidential information obtained during his employment with FirstEnergy. Flerick's supervisor testified that he received "training on complex systems" and "how we ultimately effectively work in [the] marketplace." R. 41, Hearing Tr. PageID # 908. He also indicated that Flerick had access to the components of FirstEnergy's pricing scheme. Flerick participated in weekly meetings in which the company's short- and long-term strategy was discussed. He had access to lists of prospective customers as well as to lists of closed sales that included the details of those deals. During Flerick's tenure with the company, it grew significantly, advancing from the number six supplier in its region to the number two supplier. An insider perspective into the policies and strategies of a successful company is very valuable to a competitor. Although Flerick contends that the prospective customer lists were based on public information and thus not confidential, the district court's conclusion that Flerick was privy to confidential information and retained knowledge of this information after resigning is not clearly erroneous.

The district court also found that the noncompete covenant was aimed at eliminating unfair competition. It pointed out that after moving to Reliant, Flerick had contacted Duke Realty—his

largest customer at FirstEnergy—about doing business with them. According to the district court, "[t]his is the exact [type of] unfair competition the clause clearly seeks to eliminate." R. 25, Order, PageID # 780. It was not unreasonable for the district court to find that it would be unfair for a former employee who was privy to confidential strategies developed by a highly successful company in a competitive industry to resign, immediately begin working for a direct competitor, and target his former clients.

*Second*, the covenant does not impose an undue hardship upon Flerick. The forbidden employment—selling electricity—was central to Flerick's work at FirstEnergy. Flerick was already an experienced salesman when he joined FirstEnergy, but FirstEnergy did also provide substantial training. And the covenant does not by any means bar Flerick's sole means of support or stifle his inherent skill as a salesman. It does not restrict him from working in the natural gas industry, an area in which he worked in the past. It does not restrict him from selling electricity in the forty-four states where FirstEnergy does not operate. Moreover, since Reliant operates over a broader geographic region than FirstEnergy, he can sell electricity for Reliant in Massachusetts, Texas, Connecticut, New York, Delaware, and the District of Columbia. The covenant only restricts him from directly competing with FirstEnergy in a specific region for a short period of time.

*Third*, the noncompete covenant was not injurious to the public. There is no indication that the public will be deprived of competitively priced electricity if Flerick is prohibited from competing with FirstEnergy for one year.

Apparently realizing that most of these factors do not cut in his favor, Flerick's challenge to the district court's order is directed not so much toward challenging the district court's consideration

of the relevant factors as to challenging the standard employed by the district court and outlined

above. According to Flerick:

> restrictions on employment can only be enforced when they serve the limited purpose of preventing ***unfair*** competition—that is, competition that harms a "legitimate business interest" of the former employer. And the only "legitimate business interest" recognized by Ohio's appellate courts is the protection against misuse of proprietary information or trade secrets.

Appellant Br. 13. Essentially, Flerick has taken *one of the factors* the Ohio Supreme Court directs

courts to consider—possession of confidential information—and elevated it to an absolute

requirement without which no noncompete covenant can be found reasonable. Also, although the

Ohio Supreme Court instructs courts to consider whether the employee *possesses* confidential

information, Flerick goes further and argues that a noncompete covenant is not enforceable unless

the employee is actually misusing the confidential information or there is a substantial risk of misuse.

Appellant Br. 18.

Flerick's interpretation of the standard ignores the reality that no one factor is dispositive in

the reasonableness analysis. *See Chicago Title*, 487 F.3d at 993 ("*Raimonde* lists the protection of

trade secrets as only one item to consider in assessing reasonableness, so this potential deficiency

is not dispositive of the issue."). If the Ohio Supreme Court had intended that misuse of confidential

information be the sole requirement for enforcing a noncompete covenant, it would not have

established a case-by-case reasonableness inquiry as the standard or suggested a long list of factors

to consider.

Flerick has advanced a remarkably cramped interpretation of Ohio law. In so doing, he relies

primarily on one case, *Brentlinger Enters. v. Curran*, 752 N.E.2d 994 (Ohio Ct. App. 2001), in which

the Ohio Court of Appeals upheld the trial court's ruling that a noncompete clause in a car salesman's employment agreement was unreasonable. We have cautioned against interpreting too broadly a fact-bound case evaluating a noncompete covenant. *See Chicago Title*, 487 F.3d at 993. Even aside from the fact that *Brentlinger* in no way purported to alter the well-established standard for evaluating noncompete clauses, *Brentlinger* merely upheld as a proper exercise of discretion a trial court's decision not to enforce a noncompete covenant, and its holding cannot be extended much farther than its facts. *See Brentlinger*, 752 N.E.2d at 652.

Moreover, Flerick's standard does not comport with decisions from Ohio courts or from this Court. The Ohio Supreme Court has found that an employer has a legitimate business interest in avoiding competition from court reporters whom it trained and who had direct contact with its clients. *See Rogers v. Runfola & Assocs., Inc.*, 565 N.E.2d 540, 544 (Ohio 1991). A lower Ohio court declared that an employer has a legitimate business interest in "limiting . . . a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established contact," in "preventing a former employee from using his former employer's customer lists or contacts to solicit new customers," and in "preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business." *See UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068, 1080 (Ohio Ct. App. 2001). We have indicated that an employer has a legitimate business interest in maintaining its ability to "effectively compete" in the market and in protecting customer relationships. *See Chicago Title*, 487 F.3d at 993. In light

of these cases, we agree with Flerick that an employer has a legitimate business interest in avoiding unfair competition caused by an employee's misuse of confidential information, but we disagree that this is the *only* legitimate business interest an employer can seek to protect through a noncompete covenant.

Flerick also argues that the noncompete covenant does not apply to him because his separation from FirstEnergy was the result of a termination due to downsizing. The employment agreement exempted Flerick from the noncompete restrictions if he was "terminated due to a lay off or downsizing." R. 1-2, Agreement, PageID # 16. Flerick reasons that FirstEnergy downsized the large commercial and industrial sales group when it transferred him and two others to the government aggregation group and that this transfer was the reason he left FirstEnergy.

The district court found this argument without merit and we agree. Flerick's supervisor testified that the market targeted by the government aggregation group was growing rapidly, and Flerick and the others were reassigned to help out. Their responsibilities were covered by personnel from an Ohio market that had calmed down. After being transferred and placed on the performance improvement plan, Flerick found another job. His position was not terminated due to downsizing. It terminated because he quit.

In sum, we conclude that the district court applied the correct standard, that it correctly found that the noncompete covenant was reasonable and applicable, and that FirstEnergy therefore has a strong likelihood of success on the merits.

### 2. *Irreparable Injury*

The district court found that FirstEnergy established a likelihood of irreparable harm if Flerick were not enjoined from violating his noncompete clause. We have observed that "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer*, 973 F.2d at 512. The district court pointed to Flerick's testimony that he had contacted Duke Realty after joining Reliant. Flerick admitted that he has also directly or through agents contacted customers in Pennsylvania, New Jersey, Ohio, and Maryland. If Flerick succeeds in luring FirstEnergy's potential customer base to Reliant, FirstEnergy may never be able to recover that lost business, thereby suffering irreparable harm. "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer*, 973 F.2d 512. The district court's finding on this point was not an abuse of discretion.

### 3. *Substantial Harm to Others*

The only entities that stand to suffer an adverse effect from the injunction are Flerick and Reliant. Flerick is an experienced businessman, and he signed his employment agreement with full awareness of the limitations it contained. In fact, he attempted to negotiate a less-restrictive noncompete covenant. When FirstEnergy declined his proposed alteration, Flerick evidently determined that taking the job—even subject to the disagreeable terms—was in his best interest. Reliant hired Flerick with full knowledge of the existence and terms of his noncompete covenant. Even with the injunction in place, Flerick can still sell electricity for Reliant in five states and the

District of Columbia. The district court did not abuse its discretion in finding that the harm to Flerick and Reliant did not warrant denying the injunction.

### 4. Public Interest

"[T]he public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." *National Interstate Ins. Co. v. Perro*, 934 F. Supp. 883, 891 (N.D. Ohio 1996). As stated above, there is no indication that the public will be deprived of access to competitively priced electricity if Flerick is enjoined from violating his noncompete clause. The district court did not abuse its discretion in finding that enjoining Flerick from violating his noncompete clause will advance the public interest.

## III. CONCLUSION

The district court did not abuse its discretion by granting FirstEnergy's motion for a preliminary injunction. We therefore **AFFIRM** the district court's order.