**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 19a0161n.06

**Case No. 18-3596**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| HANDEL'S ENTERPRISES, INC., dba Handel's Homemade Ice Cream & Yogurt, | ) ) ) | **FILED**<br>Apr 01, 2019<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee | ) | ON APPEAL FROM THE |
| v. | ) ) | UNITED STATES DISTRICT COURT FOR THE NORTHERN |
| KENNETH S. SCHULENBURG, Individually, and as a Principal of Moonlight101, Inc.; MOONLIGHT 101, INC.; JULIANA ORTIZ, Individually, and as a Principal of Moonlight101, Inc. | ) ) ) ) ) | DISTRICT OF OHIO |
| | ) | O P I N I O N |
| Defendants-Appellants. | ) ) | |

BEFORE:      COLE, Chief Judge; BOGGS and GIBBONS, Circuit Judges.

COLE, Chief Judge.  Defendants-Appellants Kenneth S. Schulenburg, Juliana Ortiz, and Moonlight 101, Inc. (collectively, "Defendants") appeal the district court's grant of Plaintiff-Appellee Handel's Enterprises, Inc.'s ("Handel's") motion for preliminary injunction.  Handel's underlying action seeks monetary, declaratory, and injunctive relief for Defendants' alleged misappropriation of trade secrets and breach of a non-competition clause contained in the parties' franchise agreement.  For the reasons that follow, we affirm the district court's order.

**I. BACKGROUND**

This action arises out of a franchise relationship between Handel's and Defendants.  Handel's is a franchisor in the ice-cream industry with forty-one locations in nine states, including

both company-owned and franchise locations. It is undisputed that Handel's uses products, equipment, methods, operating manuals, suppliers, and recipes exclusive to Handel's.

In October 2015, Schulenburg—who had never owned or operated an ice-cream parlor—met with Handel's to discuss the possibility of purchasing a Handel's franchise in Encinitas, California (the "Encinitas Location").[1] During the meeting, Handel's provided Schulenburg with a proposed Franchise Disclosure Document ("FDD") that included a Unit Franchise Agreement (the "Franchise Agreement") that would govern the parties' franchisor-franchisee relationship. The Franchise Agreement contained, among other things, an Ohio choice-of-law provision, the required franchise fee, and the mandatory monthly royalty payments.

Furthermore, the Franchise Agreement contained two non-complete clauses: one which applied for the duration of the franchise term, and one that applied after the franchise term expired:

**Article Five**
**IMAGE AND OPERATING STANDARDS**

5.07 Management/Conflicting and Competing Interests
…You agree that *during the initial term of the agreement* you will not directly, indirectly or in any matter whatever, be involved with any business which is competitive with, or similar to ours, in any way.

(Franchise Agreement, R. 1-3, PageID 255 (emphasis added).)

**Article Sixteen**
**THE FRANCHISEE'S RIGHTS AND OBLIGATIONS UPON**
**TERMINATION OR EXPIRATION**

16.05 Covenant Not to Compete Following Termination of the Agreement
You acknowledge and agree that Handel's name, business reputation, methods and techniques, and the experience you have derived from them, are of considerable value. In consideration of this fact, if the Agreement terminates or expires for any reason whatsoever, the franchisee and the principal jointly and severally covenant and agree, that neither of them will without the prior written consent of Handel's at any time *during the period ending 2 years after the date of such expiration or termination*, directly or indirectly or in any matter whatsoever or through any

---

[1] According to the complaint, co-defendant Ortiz was Schulenburg's unauthorized business partner in this venture, and their company was Moonlight101, Inc., the third co-defendant.

person, or be in any way associated with any business involving the sale of ice cream or frozen dairy and related products and services:

> (a) in the Territory; or
>
> (b) within 2 miles of any Handel's franchised or company-owned store[.]

(*Id.* at PageID 260 (emphasis added).) The "Territory," as used in Section 16.05, was defined as a "three-mile radius surrounding the Lofts at Moonlight Beach"—the proposed Encinitas Location—as well as "an additional area in the Gas lamp [sic] district [in downtown San Diego] per the attached boundaries map." (*Id.* at PageID 282.) According to the boundaries map, the additional area in the Gaslamp district—a location contemplated by the parties for a potential second franchise—covered approximately eight blocks.

Finally, the Franchise Agreement also included a provision regarding Handel's trade secrets:

**Article Seven**
**TRADE SECRETS OF THE FRANCHISOR**

7.01   You acknowledge and agree that your total knowledge of the System, and construction, operation and promotion of the Ice Cream Parlor, is derived from information we disclosed to you under this Agreement, Handel's Manuals and otherwise, and that such information is proprietary, confidential and a trade secret of Handel's. You, as franchisee and principal, jointly and severally covenant and agree that you will maintain the absolute confidentiality of all such information during and after the term of this Agreement, and not use this information in any other business or manner unless approved in writing by Handel's. You must not divulge this information to any employee except as expressly permitted in section 4.08, and then only in circumstances of confidence, and only to the extent necessary for the efficient and proper operation of the Ice Cream Parlor. You must obtain a written covenant from each of your employees before making any disclosure of this information to them.

(*Id.* at PageID 256.)

Schulenburg and Handel's executed the Franchise Agreement for the Encinitas Location on January 22, 2016, commencing a five-year initial term.

As a franchisee, Schulenburg received confidential information pertaining to Handel's operations. Some of that information was provided to Schulenburg and Ortiz during their

participation in a mandatory two-week franchise training in Ohio, and other information was distributed via Handel's Confidential Operations Manual ("the Manual"). Specifically, the Manual contained the "specifications, standard, and procedures" for operating a Handel's franchise, as well as the flavors and method for creating each flavor. The Franchise Agreement explicitly stated that the franchisee agreed "to keep the contents [of the Manual] confidential[,]" and all employees were to sign written non-disclosure covenants before a franchisee could disclose the contents of the Manual to them.

In mid-2017, Schulenburg began to discuss with Handel's the development of a second franchise in the Gaslamp district (the "Gaslamp Location"). In the midst of negotiations over the Gaslamp Location, Schulenburg informed Handel's that he did not think he should have to pay a separate franchise fee for the new location, did not wish to sign another franchise agreement, and refused to provide a final lease of the proposed Gaslamp Location to Handel's. Consequently, Handel's did not approve the Gaslamp Location franchise.

Nevertheless, Schulenberg executed a lease and proceeded with plans to open an ice-cream parlor at the Gaslamp Location. On December 15, 2017, Handel's sent Defendants a notice of breach, noting Defendants' failure to obtain approval of the lease, pay the franchise fee, or execute the required FDD. On December 26, 2017, Defendants informed Handel's via email that they "agreed to sign off on the locations but want[] to do it in person."

Despite these representations, Defendants instead filed an action in California state court (the "California Action"), seeking rescission of the Franchise Agreement due to the FDD allegedly not being approved by the California Department of Business Oversight.[2]

---

[2] The California Action was removed to federal court and eventually dismissed.

In response to the California Action, Handel's initiated the instant action against Defendants on March 5, 2018, asserting claims for, *inter alia*, misappropriation of trade secrets and breach of contract. Simultaneously, Handel's sought a preliminary injunction to prevent Defendants from operating an ice-cream parlor at the Gaslamp Location, arguing that the Gaslamp Location would unfairly compete with the Encinitas Location and necessarily "use Handel's proprietary, confidential, and trade secret information." (Motion for PI, R. 3.)

On May 9, 2018, the district court held a hearing on the motion for preliminary injunction, at which time Defendants informed the court that the Gaslamp Location was already open for business, under the name Cali Cream Homemade Ice Cream ("Cali Cream"). On June 22, 2018, the district court granted Handel's motion for preliminary injunction. Accordingly, the court enjoined Defendants "from being directly, indirectly, or in any manner whatsoever involved with any business which is competitive with or similar to Handel's in any way, including the operation of any non-Handel's ice cream parlor, including specifically the Cali Cream Homemade Ice Cream retail business[.]" (Order, R. 43, PageID 1206.)

Defendants timely appealed**,** and their motion to stay the preliminary injunction pending appeal was denied.

## II.  DISCUSSION

"The grant or denial of a preliminary injunction is reviewed for an abuse of discretion." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "This standard of review is 'highly deferential' to the district court's decision." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). Accordingly, a district court's determination will be disturbed only if it "relied upon clearly erroneous findings of fact, improperly applied the

governing law, or used an erroneous legal standard." *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012). With this standard in mind, "we review the district court's legal conclusions *de novo* and its factual findings for clear error." *Certified Restoration*, 511 F.3d at 541 (quoting *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003)).

In determining whether to issue a preliminary injunction, a district court should consider four factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *See, e.g.*, *Overstreet*, 305 F.3d at 573 (citing *Leary*, 228 F.3d at 736). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Id.* Indeed, the factors are intended to "guide the discretion of the court; they are not meant to be rigid and unbending requirements." *McNeilly*, 684 F.3d at 615 (citation omitted). The party seeking the preliminary injunction bears the burden of justifying such relief, *id.*, but a party is "not required to prove [its] case in full at a preliminary-injunction hearing." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1982). Here, the balancing of the four factors supports the district court's granting of the preliminary injunction.

### A. Strong Likelihood of Success on the Merits

The first factor to consider is whether Handel's has demonstrated "a strong likelihood of success on the merits." *Certified Restoration*, 511 F.3d at 543 (citation omitted). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). To meet its burden, Handel's "must show more than a mere possibility of success." *Certified Restoration*, 511 F.3d at 543 (quoting *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th

Cir. 1997)). Defendants argue that the district court erred in finding that Handel's had demonstrated probable success on the merits of its claim for both (1) misappropriation of trade secrets and (2) breach of the non-compete clause. Both are discussed in turn.

### 1. *Misappropriation of Trade Secrets*

"In order to prevail on a misappropriation-of-trade-secret claim, a plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008). Defendants dispute that Handel's made the requisite showing for the first and third elements—the existence of a trade secret and unauthorized use.

### i. Existence of a Trade Secret

"The question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the great weight of the evidence." *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam) (citing *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 24 Ohio St. 3d 41 (1986)). Ohio defines a trade secret as "information" that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Uniform Trade Secrets Act ("UTSA"), O.R.C. § 1333.61(D).[3]

---

[3] The parties do not dispute that Ohio law applies. Accordingly, "[w]hile we apply our own procedural jurisprudence regarding the factors to consider in granting a preliminary injunction, we apply [Ohio] law to determine whether [Handel's] has met the first of these factors by demonstrating a substantial likelihood of success on the merits of [its] underlying diversity action." *Certified Restoration*, 511 F.3d at 541; *see also id.* ("When interpreting contracts in a diversity action, we generally enforce the parties' contractual choice of forum and governing law.").

The Supreme Court of Ohio has articulated six factors to consider in determining whether an item constitutes a trade secret: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Heartland Home Fin., Inc.*, 258 F. App'x at 861–62 (citing *State ex rel. Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St. 3d 513 (1997)). Although no factor is dispositive, the Ohio Supreme Court has emphasized that "[a] business or possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status." *Id.* (quoting *State ex rel. Plain Dealer*, 80 Ohio St. 3d at 525).

Defendants contend that the district court "simply took Handle's [sic] at its word" and held that its materials constituted trade secrets, when in actuality the alleged trade secrets were "never clearly defined." In rejecting those same arguments, the district court held that Handel's had sufficiently alleged the existence of trade secrets: the Manual contained the "specifications, standards, and procedures" for operating a Handel's franchise; the Franchise Agreement described the confidential information given to Defendants as the "total knowledge of [Handel's] System, and construction, operation, and promotion"; and the in-person training provided sensitive information to Defendants. (Op. & Order, R. 42, PageID 1194–95.) Further, the district court noted that Handel's took precautions to maintain the secrecy of the confidential information by requiring Schulenburg to sign the Franchise Agreement, which explicitly safeguarded the

confidentiality of the information and required all employees to sign non-disclosure agreements before learning the contents of the Manual.

We agree with the district court's assessment. It is clear from the record that the information provided to Defendants regarding Handel's operations and procedures was not known outside the business, was heavily restricted with confidentiality agreements, and was developed over the decades during which Handel's has been operating. Consequently, the evidence supports the district court's conclusion that the information at issue qualified as a trade secret under the UTSA.

### ii. The Unauthorized Use of a Trade Secret

Defendants next argue that Handel's offered "no proof that any trade secret was being *used* at the Cali Cream location—only the unsupported assertion that because Schulenburg and Ortiz were new to the ice cream business *they must* be using Handel's trade secrets." (Appellant Br. 22.) As Handel's correctly notes, however, under Ohio law, "an actual or *threatened* misappropriation of trade secrets may be enjoined." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 968 (6th Cir. 2002) (emphasis added) (citing O.R.C. § 1333.62); *see also Procter & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 274 (2000) ("Ohio courts have held that an actual threat of harm exists when an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him or her to compete directly with the former employer or the product line that the employee formerly supported.").

It is undisputed that Defendants were provided—and still have access to—Handel's trade secrets, including the Manual containing recipes and unique ingredients for each ice cream flavor. Further, evidence was presented by Handel's at the preliminary injunction hearing that Defendants placed an unusually large order of flavors in January 2018, leading Handel's to believe

Schulenburg was stocking up flavors for his new store. In light of this evidence, we agree with the district court that an actual or threatened misappropriation of trade secrets was present.

Handel's thus presented a strong likelihood of success on the merits of its misappropriation-of-trade-secrets claim.

### 2. *Breach of the Non-Compete*

Under Ohio law, a non-compete covenant is reasonable if it (1) is no greater than is required for the protection of the employer; (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007) (citing *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21 (1975)). "Each of these elements must be established by clear and convincing evidence." *Herbst*, 39 F. App'x at 968 (citing *Clark v. Mt. Carmel Health*, 124 Ohio App. 3d 308 (1997)). Ultimately, the reasonableness of a non-compete covenant "is determined on a case-by-case basis." *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 526 (6th Cir. 2013). Defendants focus their argument on the first element and contend that the temporal and spatial prohibitions in Section 5.07—the non-compete covenant applicable during the franchise agreement term—were overbroad.

Looking to Section 5.07, as Handel's notes, the non-compete covenant is limited by its very terms. The covenant is applicable and relevant only during the term of the Franchise Agreement—in this case, until January 22, 2021. This limited temporal restriction is reasonable under Ohio law. *See, e.g.*, *Proctor & Gamble*, 747 N.E.2d 268, 278 (Ohio Ct. App. 2000); *Parma Int'l Inc. v. Herman*, No. 54243, 1989 WL 12928, at *2–4 (Ohio Ct. App. Feb. 16, 1989). As for the spatial prohibition in Section 5.07, we agree with the district court that the geographic restrictions are reasonable. (Op. & Order, R. 42, PageID 1198 (citing *Try Hours, Inc. v. Douville*,

985 N.E.2d 955 (Ohio Ct. App. 2013) and *Blakeman's Valley Office Equip., Inc. v. Berdeman*, 786 N.E.2d 914 (Ohio Ct. App. 2003)).)

To the extent Defendants also challenge Section 16.05, the Franchise Agreement makes clear that the "Territory" in which Defendants cannot compete for two years after the agreement ends encompasses the three-mile radius surrounding the Encinitas Location, as well as the approximately eight blocks in the Gaslamp district. Given Handel's business interests, we agree with the district court that these geographic restrictions are reasonable. *See, e.g.*, *Flerick*, 521 F. App'x 521 (applying Ohio law and upholding a non-compete covenant that spanned six states because that was the region in which the employer conducted its business); *see also Blakeman's Valley Office Equip., Inc. v. Bierdeman*, 152 Ohio App. 3d 86 (2003) (enforcing covenant not to compete that spanned three counties).

In sum Handel's has also presented a strong likelihood of success on the merits of its claim for breach of the non-compete clause. Consequently, the first factor soundly weighs in Handel's favor.

### B. Irreparable Harm

The second factor a court must consider in its preliminary injunction analysis "is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration*, 511 F.3d at 550. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578 (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

Defendants contend that because Handel's did not show that any trade secret was being used, Handel's will not suffer any harm from misappropriated trade secrets. For the reasons explained above, Defendants' premise is incorrect. Furthermore, the record indicates that Handel's

would suffer an irreparable injury without the injunction. As mentioned at the preliminary injunction hearing, an article in the San Diego Reader, titled "We All Scream Déjà Vu: New Ice Cream Shop has the Feel of an Old One," described Cali Cream as "almost an exact replica" of Handel's. (PI Hr'g Tr., R. 48, PageID 1241; Supp. Authority, R. 38, PageID 1100–07.) The article discussed the success of the Encinitas Location and noted, "Sure enough, Cali Cream is owned and operated by the same folks as the Encinitas Handel's and they basically brought its winning formula downtown." (Supp. Authority, R. 38, PageID 1106.) Another article discussing the opening of Cali Cream noted that consumers should "[e]xpect replication of Handel's [flavor] favorites" such as "Oree Dough" and "Graham Central Station." (*Id.* at PageID 1110.)

Accordingly, as the district court recognized, the opening of Cali Cream created a strong risk of market confusion, along with the loss of fair competition and customer goodwill from existing and prospective customers. *See Tri-Cty. Wholesale Distrib., Inc. v. Wine Grp., Inc.*, 565 F. App'x 477, 483 (6th Cir. 2012) (holding that "[t]he loss of a product which is unique . . . can cause a drop in customer goodwill") (internal quotation marks and citations omitted); *Basicomputer Corp.*, 973 F.2d at 512 ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute.").

This factor thus weighs in favor of a preliminary injunction.

## C. Substantial Harm to Others

The third factor we must consider is whether the issuance of the injunction would cause substantial harm to others. *Certified Restoration*, 511 F.3d at 550–51. The district court weighed this factor in favor of Handel's, noting that although Defendants likely would be harmed by an injunction, this self-inflicted harm was the result of Defendants' willful actions and was outweighed by the harm to Handel's. (Op. & Order, R. 42, PageID 1201.) Indeed, Defendants

were well-aware of the risks associated with opening a competing store, had prior notice of Handel's motion for preliminary injunction, yet opened a competing business anyway. Defendants do not challenge this finding and thus we need not further address it. *See Tri-Cty. Wholesale Distrib., Inc.*, 565 F. App'x at 483.

### D. Public Interest

Defendants also did not challenge the final factor, "whether the public interest would be served by the issuance of the injunction." *Certified Restoration*, 511 F.3d at 551. We note, however, that the "public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." *Flerick*, 521 F. App'x at 529 (citations omitted).

Having reviewed the preliminary-injunction factors, we find that the district court did not abuse its discretion in finding that Handel's was entitled to its requested preliminary injunction.

### E. Scope of Preliminary Injunction

Alternatively, Defendants contend that even if the preliminary injunction is warranted, it is broader than necessary to protect Handel's commercial interests and does not contain a well-defined set of prohibitions. Defendants' argument, however, is just another round-about challenge to the reasonableness of Handel's non-compete clause. For the same reasons that Handel's non-compete covenant is reasonable, so too is the district court's preliminary injunction.

### III. CONCLUSION

For those reasons, we affirm the district court's order.